# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LVI GROUP INVESTMENTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12067-VCG |
| | ) | |
| NCM GROUP HOLDINGS, LLC, SUBHAS KHARA, EVERGREEN PACIFIC PARTNERS, L.P., EVERGREEN PACIFIC PARTNERS GP, LLC, EVERGREEN PACIFIC PARTNERS II, L.P., EVERGREEN PACIFIC PARTNERS II GP, L.P., EVERGREEN PACIFIC PARTNERS II GP, LLC, EVERGREEN PACIFIC PARTNERS MANAGEMENT COMPANY, INC., TIMOTHY BRILLON, MICHAEL NIBARGER, and TIMOTHY BERNARDEZ, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| NCM GROUP HOLDINGS, LLC, | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| LVI GROUP INVESTMENTS, LLC, SCOTT STATE, PAUL CUTRONE, NORTHSTAR GROUP HOLDINGS, LLC, LVI PARENT CORP., BRIAN SIMMONS, ROBERT HOGAN, and CHS PRIVATE EQUITY V, L.P. | ) ) ) ) ) ) ) | |
| | ) | |
| | ) | |
| Counter-Defendants. | ) | |

Date Submitted: September 4, 2019
Date Decided: December 31, 2019

Rudolf Koch, Matthew W. Murphy, and Matthew D. Perri, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Steven C. Florsheim, Greg Shinall, Daniel A. Shmikler, Michael G. Dickler, and Trevor K. Scheetz, of SPERLING & SLATER, P.C., Chicago, Illinois, *Attorneys for Plaintiff/Counter-Defendant LVI Group Investments, LLC.*

Richard D. Heins, and Philip Trainer, Jr., of ASHBY & GEDDES, Wilmington, Delaware; OF COUNSEL: Stephen Novack, Donald A. Tarkington, Andrew D. Campbell, Elizabeth C. Wolicki, and Yvette V. Mishev, of NOVACK AND MACEY LLP, Chicago, Illinois, *Attorneys for Defendant/Counter-Plaintiff NCM Group Holdings, LLC, and Defendants Evergreen Pacific Partners, L.P., Evergreen Pacific Partners II, L.P., Evergreen Pacific Partners GP, LLC, Evergreen Pacific Partners II GP, L.P., Evergreen Pacific Partners II GP, LLC, Evergreen Pacific Partners Management Company, Inc., Timothy Brillon, Michael Nibarger, and Timothy Bernardez.*

Peter B. Ladig, of BAYARD P.A., Wilmington, Delaware, *Attorneys for Defendant/Counter-Plaintiff NCM Group Holdings, LLC as to Claims Against Brian Simmons, Robert Hogan, and CHS Private Equity V, L.P.*

John A. Sensing, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: John J. Quinn, THE LAW OFFICES OF JOHN J. QUINN; Dylan P. Kletter and Kelsey D. Bond, of BROWN RUDNICK LLP, Hartford, Connecticut, *Attorneys for Defendant Subhas Khara.*

Thomas A. Uebler and Kerry M. Porter, of MCCOLLUM D'EMILIO SMITH UEBLER LLC, Wilmington, Delware; OF COUNSEL: Jeffrey H. Bergman of MANDELL MENKES LLC, Chicago, Illinois, *Attorneys for Brian Simmons, Robert Hogan, and CHS Private Equity V LP.*

GLASSCOCK, Vice Chancellor

This is the latest chapter in the complicated legal saga resulting from the creation of a demolition company, NorthStar. The parties and related entities are described in detail below. Sufficient to this introductory exposition is that NorthStar was formed by a combination of two large demolition contractors, which can be identified generally as LVI and NCM. After the merger, the resulting demolition company was known as NorthStar, and the LVI and NCM entities remained as holding companies, containing their respective interests in NorthStar.

These ownership interests in NorthStar were determined in part by the respective EBITDAs of the component companies. The business of these demolition companies involved long-term—often multi-year—projects. Moreover, payment by the owner of the property being demolished, or the contractor with which LVI and NCM subcontracted, was only partly in cash. The business model, in fact, was for the demolition company to monetize each contract by removing and selling valuable scrap, the value of which was estimated at the beginning of each job. Because of the nature of these businesses, then, accounting was somewhat complex. As described in some detail below, the value of any job in a given accounting period was the result of allocation of costs and revenues incurred and estimated, and gave room for both good-faith error and (as alleged by both parties) fraud in connection with the computing of the interests of LVI and NCM in NorthStar.

Despite its name, NorthStar, starting soon after formation, had, in fact, a trajectory: downward.[1] LVI and NCM have sued each other and related individuals and entities, alleging the fraud referenced above. Much motion practice has resulted.[2] This Memorandum Opinion addresses four motions for Summary Judgment. The results are below.

Equity enthusiasts,[3] and students of Anglo-American legal history generally, should they persevere in digesting this Decision, will note that what follows involves tort claims in the context of a contract, and parties pursuing legal issues in way of damages; those readers may wonder why such a clearly legal matter has been imposed on this court of equity. At this action's long-ago conception, the Plaintiff and Counter-Plaintiff contemplated reallocation of their interests in NorthStar, an equitable remedy. Thus, equitable jurisdiction was present, and litigant's efficiency requires that the matter remain in Chancery.

---

[1] NorthStar's performance was, in fact, dis-asterous.

[2] *See LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2018 WL 1559936 (Del. Ch. Mar. 28, 2018); *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2017 WL 3912632 (Del. Ch. Sept. 7, 2017); *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2017 WL 1174438 (Del. Ch. Mar. 29, 2017).

[3] Some exist.

# I. BACKGROUND[4]

## A. Parties and Relevant Non-Parties

Plaintiff and Counter-Defendant LVI Group Investments, LLC ("LVI" or "LVI LLC") is a Delaware limited liability company.[5] Counter-Defendant LVI Parent Corp. ("LVI Parent") is a Delaware corporation.[6] LVI Parent operated through its subsidiaries and sat at the head of the LVI family of entities until shortly before the Merger, when it created LVI LLC.[7] Where pertinent, I strive to distinguish the LVI entities by referring specifically to "LVI LLC" and "LVI Parent." Otherwise, when referring generally to the pre-merger operations of the LVI family of companies, or to allegations by and against the Plaintiff, I refer simply to "LVI."

Defendant and Counter-Plaintiff NCM Group Holdings, LLC ("NCM") is a Delaware limited liability company.[8]

---

[4] I base the facts for this summary judgment ruling on the evidence submitted under affidavit with the parties' papers.

[5] Transmittal Aff. of Hayley M. Lenahan in Support of the Defs.' Br. In Support of Their Mot. for Summ. J., Docket Items ("D.I.") 654–58, 686–90, 715 ("Lenahan Aff."), Ex. 1, Ans. & Affirmative Defenses to LVI Grp. Invs., LLC's Verified Am. Compl. ("EPP Ans."), ¶ 6.

[6] Transmittal Aff. of Matthew D. Perri, Esq. in Support of LVI Grp. Invs., LLC's Opening Br. In Support of Its Mot. for Summ. J., D.I. 667–69, 719 ("Perri Aff."), Ex. 15, Contribution Agreement by and among NCM Grp. Holdings, LLC, LVI Grp. Invs. LLC, NorthStar Grp. Holdings, LLC, & LVI Parent Corp. ("Contribution Agreement"), *Preamble*.

[7] *See id. Recitals*.

[8] *Id. Preamble*.

3

Defendant Subhas Khara was NCM's former President and CEO.[9]

Defendants Evergreen Pacific Partners, L.P. and Evergreen Pacific Partners II, L.P. (the "EPP Funds") are Delaware limited partnerships.[10] Evergreen Pacific Partners GP, LLC and Evergreen Pacific Partners II GP, LLC (the "EPP GPs") are general partners to the EPP Funds and are Delaware limited liability companies.[11] Evergreen Pacific Partners II GP, L.P. is a Delaware limited partnership.[12] Evergreen Pacific Partners Management Company, Inc. ("EPP Management") is a Delaware corporation.[13] It provides administrative support to the EPP Funds and the EPP GPs.[14] The EPP Funds are significant equity owners in NCM.[15]

Defendants Timothy Brillon, Michael Nibarger, and Timothy Bernardez are individuals who work with the EPP entities.[16] Brillon is the CFO and CCO of EPP

---

[9] EPP Ans., ¶ 8.

[10] *Id.* ¶ 9.

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] Lenahan Aff., Ex. 5, Dep. of Michael A. Nibarger ("Nibarger Dep."), at 45:22–46:5. Because the parties sometimes include different portions of depositions in different exhibits, where relevant, I include a reference to the exhibit where the cited portion of the deposition may be found, even where the deposition as a whole has previously been cited.

[15] *See* EPP Ans., ¶ 9 (detailing ownership stake of EPP Funds in NCM at the time of the transaction); *see also* Transmittal Aff. of John A. Sensing, D.I. 659–63 ("Sensing Aff."), Ex. 9, Confidential Information Mem. prepared by Houlihan Lokey, at 12 (providing graphic of NorthStar corporate structure showing ownership interest of EPP).

[16] EPP Ans., ¶¶ 10–12.

Management and also a member of the EPP GPs.[17]  Nibarger is a Vice President and Secretary of EPP Management, co-founder of the EPP Funds, and member of the EPP GPs.[18]  Bernardez is a co-President of EPP Management, co-founder of the EPP Funds, and a member of each of the EPP GPs.[19]  I refer to the EPP Funds, the EPP GPs, EPP Management, and Brillon, Nibarger, and Bernardez collectively as "EPP."

CHS Private Equity V L.P. ("CHS") is a Delaware limited partnership.[20] Brian Simmons and Robert Hogan are partners of CHS.[21]  I refer to Simmons, Hogan, and CHS collectively as the "CHS Defendants."  CHS is one of several private equity owners of LVI.[22]

Nominal Defendant NorthStar Group Holdings, LLC ("NorthStar") is a Delaware limited liability company.[23]  It was the creation of NorthStar by LVI and NCM that was the impetus for this legal action.

---

[17] *Id.* ¶ 12; Lenahan Aff., Ex. 7, Dep. of Tim Brillon ("Brillon Dep."), at 13:20–14:10.

[18] EPP Ans., ¶ 10; Nibarger Dep., at 7:21–8:4.

[19] EPP Ans., ¶ 11; Lenahan Aff., Ex. 6, Dep. of Timothy D. Bernardez ("Bernardez Dep."), at 75:10–76:13.

[20] Def. NCM Grp. Holdings, LLC's Ans., Affirmative Defenses and Third Am. Verified Countercl. to LVI Grp. Invs., LLC's Verified Am. Compl., D.I. 789 ("NCM Countercl."), ¶ 12.

[21] *Id.* ¶¶ 13–14.

[22] *See* Sensing Aff., Ex. 9, Confidential Information Mem. prepared by Houlihan Lokey, at 12 (providing graphic of NorthStar corporate structure showing CHS' ownership interest in LVI).

[23] Lenahan Aff., Ex. 8, Counter-Def. LVI Parent Corp.'s Ans. & Affirmative Defenses to NCM Grp. Holdings, LLC's Sec. Am. Verified Countercl. ("LVI Parent Ans."), ¶ 11; EPP Ans. ¶ 18.

*B. Factual Background*

### 1. LVI and NCM Merge to Form NorthStar

Prior to their merger, LVI and NCM were two of the United States' largest demolition and remediation companies, operating nationwide.[24] Their business models were similar. Both companies made money through two primary channels: site owners paid to have properties demolished, and the companies then retained and resold salvage materials such as steel, copper, alloys, and equipment from the building sites.[25] Both companies operated through a network of branch offices, each overseen by a branch manager.[26] The branch managers, in turn, received reports from project managers who supervised demolitions at particular sites.[27]

In 2013, LVI and NCM entered into negotiations regarding a potential business combination.[28] Both parties undertook extensive due diligence.[29] This process culminated on April 23, 2014, when NCM, LVI LLC, LVI Parent, and

---

[24] Lenahan Aff. Ex. 3, Expert Report of Louis G. Dudney, CPA/CFF, dated March 26, 2018 ("Dudney Report"), at 5; *see also* EPP Ans., ¶ 1.

[25] *See* Dudney Report, at 18–20.

[26] *Id.* at 15 ("NCM manage[d] its operations using a regional model with branch offices and satellite offices to provide broad geographic coverage and local market expertise"); Lenahan Aff., Ex. 11, Dep. of John Leonard ("Leonard Dep."), at 18:14–21 (describing LVI branch manager responsibilities as "reviewing estimates, overseeing the execution of projects, and direct oversight of the [profits and losses] for the . . . office.").

[27] Lenahan Aff., Ex. 12, Dep. of Bryn DiLoreto ("DiLoreto Dep."), at 29:15–30:6 (describing project manager duties).

[28] EPP Ans., ¶ 18.

[29] *See, e.g.*, Perri Aff., Ex. 1, Dep. of Scott State ("State Dep."), at 89:21–24, 96:1-20; Perri Aff., Ex. 2, Brillon Dep., at 209:6–12, 266:2–277:22.

NorthStar entered an agreement (the "Contribution Agreement"), under which LVI and NCM contributed their assets to form a new company, NorthStar (the "Merger").[30]

The structure of the Merger was unusual, and that structure is pertinent, at least in part, to this decision. Since 2002, the LVI family of companies operated under LVI Parent.[31] Thus, it was LVI Parent that began negotiating the Merger with NCM, conducted due diligence, and worked with NCM to combine the businesses.[32] Shortly before the Merger, LVI Parent undertook a transformation from parent corporation to contributed asset. On April 7, 2014—16 days before the Merger's consummation—LVI Parent created LVI LLC.[33] LVI Parent then merged with a subsidiary of LVI LLC.[34] As a part of the Contribution Agreement, LVI LLC contributed its subsidiaries (including LVI Parent, now a subsidiary), along with NCM subsidiaries, to form NorthStar.[35] LVI Parent still exists as a subsidiary of

---

[30] Contribution Agreement, *Recitals*.

[31] *See* Lenahan Aff., Ex. 126, NCM Grp. Holdings, LLC's Ans., Affirmative Defenses & Sec. Am. Countercl. to LVI Grp. Invs., LLC's Verified Am. Compl. ("NCM Sec. Am. Countercl."), Ex. B, at 9. LVI Parent was incorporated in 2002 and acquired LVI Services, Inc., through which it operated. *Id.*

[32] LVI Parent Ans., ¶ 17 (noting LVI Parent engaged in the Merger negotiations). LVI Parent, for instance, made the required filing to obtain clearance from the FTC. *Id.*; Lenahan Aff., Ex. 127, NorthStar Grp. Holdings, LLC's Opp'n To NCM Grp. Holdings, LLC's Am. Mot. for Leave to File Sec. Am. Countercl., at Ex. H.

[33] *See* Contribution Agreement.

[34] *Id. Recitals*.

[35] *Id.* § 1.2.

NorthStar, and it holds the stock of LVI Services, Inc., which in turn holds all the stock of the other contributed LVI subsidiaries.[36] The parties chose this structure to create a tax-free transaction.[37]

Although no longer conducting operations following the Merger, LVI and NCM remained in existence as holding companies that owned NorthStar equity.[38] LVI and NCM split NorthStar's equity based largely on their respective pre-merger Earnings Before Interest Taxation Depreciation and Amortization ("EBITDA").[39] Using this measuring stick, LVI obtained 62.5% of the equity, and NCM 37.5% of the equity, in NorthStar.[40]

### 2. Terms of the Contribution Agreement

In the Contribution Agreement, both LVI and NCM warranted certain financial statements regarding their companies (the "Warranted Financial Statements").[41] The Warranted Financial Statements formed the basis for the companies' EBITDA and thereby the divide of the equity ownership in NorthStar.[42] Under §§ 2.4(a) and 3.4(a) of the Contribution Agreement, the Warranted Financial

---

[36] *Id.*

[37] *Id. Recitals*.

[38] *See id.* § 1.2.

[39] *See id.*

[40] *Id.* § 1.2(b).

[41] *Id.* §§ 2.4(b), 3.4(b).

[42] *See id.* Schedules 2.4(b) and 3.4(b).

Statements included the audited year-end financial statements for the period ending December 31, 2012, the unaudited year-end financial statements for the period ending December 31, 2013, and the unaudited year-end financial statements for the two months ending February 28, 2014.[43] NCM and LVI represented that the Warranted Financial Statements fairly presented, in all material respects, the financial position of the businesses in accordance with Generally Accepted Accounting Principles ("GAAP").[44] The companies did not make representations or warranties regarding any other financial statements.[45]

The Contribution Agreement includes a merger clause in § 6.6, providing that it would "constitute the entire Agreement between the Parties pertaining to the subject matter herein and supersede any prior representation, warranty, covenant, or agreement of any Party regarding such subject matter."[46] The Contribution Agreement also includes a non-reliance provision. Under § 5.4(f), the parties agreed they had not "relied on any statements, representations or warranties whatsoever" outside of the Agreement."[47] Therefore, the Warranted Financial Statements

---

[43] *Id.* §§ 2.4(a), 3.4(a).

[44] *Id.* §§ 2.4(b), 3.4(b).

[45] *Id.* § 5.4(f).

[46] *Id.* § 6.6.

[47] *Id.* § 5.4(f).

9

attached to the Contribution Agreement formed the only representations on which the parties could successfully sue for contractual remedies, following the Merger.

The Contribution Agreement provides for specific remedies in case of breach or misrepresentation. Section 5.4(e) limits available remedies to indemnification claims, requests for injunctive relief, and fraud claims against the "Person who committed such fraud."[48] Section 5.1 limits these remedies by imposing time restrictions on the Warranted Financial Statements. Under § 5.1(a)(iii)–(iv), the parties' representations regarding the Warranted Financial Statements would expire on April 23, 2015—one year after the Merger's execution.[49] However, the Contribution Agreement contains a survival clause, allowing the parties to postpone the expiration of the representations and warranties by filing a notice of claim under § 5.1(c):

> Notwithstanding the foregoing in this Section 5.1, **any representation or warranty in respect of which indemnity may be sought** under Section 5.2 below, **and the indemnity with respect thereto, will survive** the time at which it would otherwise terminate pursuant to this Section 5.1 **if notice of the inaccuracy or breach** or potential inaccuracy or breach thereof giving rise to such right or potential right of indemnity **will have been given** to the party against whom such indemnity may be sought **prior to such time**. . . .[50]

---

[48] *Id.* § 5.4(e) ("The sole and exclusive remedies of the Parties arising out of, relating to or resulting from this Agreement . . . will be strictly limited to (i) the indemnification provisions contained in this <u>Article 5</u>, (ii) the provisions of <u>Section 5.6</u> [specific performance] and (iii) claims for fraud against the Person who committed such fraud.").

[49] *Id.* § 5.1(a)(iii)–(iv).

[50] *Id.* § 5.1(c) (emphasis added).

Finally, in § 5.2(a)–(b), the Contribution Agreement provides for indemnification for NorthStar and the contributed assets in case of a breach or misrepresentation by LVI or NCM:

(a) Indemnification by NCM Holdings. Subject to the other terms of this Article 5, NCM Holdings will indemnify and hold harmless [NorthStar] and each of its Subsidiaries from and against all Losses arising out of, relating to or resulting from (i) any failure of any Surviving NCM Representation to be true or (ii) any breach of any covenant or agreement of NCM Holdings herein.[51]

(b) Indemnification by LVI Holdings. Subject to the other terms of this Article 5, LVI Holdings will indemnify and hold harmless [NorthStar] and each of its Subsidiaries from and against all Losses arising out of, relating to or resulting from (i) any failure of any Surviving LVI Representation to be true or (ii) any breach of any covenant or agreement of LVI Holdings herein.[52]

### 3. Post-Merger Litigation

Just shy of a year after the merger, NCM notified LVI of an indemnification claim based on alleged false representations in its Warranted Financial Statements.[53] The next day, LVI notified NCM of its own indemnification claim.[54] The parties underwent mediation as required by the Contribution Agreement, and when that failed, commenced litigation.[55] Both parties ultimately dropped their

---

[51] *Id.* § 5.2(a).

[52] *Id.* § 5.2(b).

[53] LVI Parent Ans., ¶ 28.

[54] EPP Ans., ¶ 98.

[55] LVI Parent Ans., ¶ 35.

indemnification claims and proceed solely on claims for fraud (as well as conspiracy or aiding and abetting, and unjust enrichment claims against EPP).[56] This litigation centers on the alleged fraud by both parties in creating their respective Warranted Financial Statements.

After extensive discovery, each party narrowed their fraud allegations to a limited number of pre-Merger projects of the other company.[57] LVI's allegations focus on four NCM projects.[58] The parties refer to these as the Apple, Pepco, Sunoco, and DuPont Hickory projects.[59] LVI's expert asserts that based on a review of these projects, NCM misstated its pre-merger EBITDA by approximately $3.4 million for the trailing twelve month period ending December 31, 2013 and approximately $5.2 million for the trailing twelve month period ending February 28, 2014.[60] NCM's allegations, in turn, focus on six LVI projects. The parties refer to these as the Holly Street, Alcoa, HECO, Foothill, Newark, and Lafayette projects.[61]

---

[56] *See* D.I. 653 (stipulating dismissal of indemnity claims and counterclaims). Section 5.4(b) of the Contribution Agreement allowed the parties to recover a maximum of $15 million for indemnity; fraud, by contrast, has no recovery cap. Contribution Agreement § 5.4(b).

[57] The parties' claims and counterclaims contemplate a wider collection of fraudulent projects, but through discovery each party has effectively reduced those allegations to the projects identified in their respective expert reports. *See* Dudney Report; Lenahan Aff., Ex. 51, Expert Report of Erin P. Roberts, CPA, dated March 26, 2018 ("Roberts Report").

[58] *See* Dudney Report, at 83–110.

[59] *See id.* at 12.

[60] *Id.* at 128.

[61] *See* Roberts Report, at 5–6.

NCM's expert opines that LVI fraudulently misstated its pre-Merger EBITDA by at least $10.9 million.[62]

For the reader to understand the cross-claims for fraud arising from these unique projects, it is necessary to address the projects in detail, which this Memorandum Opinion does, I am afraid, in wearisome fashion, below.

Also, because the parties represented that their Warranted Financial Statements complied with GAAP, the allegations involve some basic principles of GAAP, reviewed briefly here. First, GAAP permits the use of the percentage of completion ("POC") method of accounting for contracts.[63] POC allows a business to recognize income during a long project based on the percentage of the project completed, estimated costs of completion, and expected profit margin.[64] Both parties used POC to create financial statements for their various demolition projects.[65] This allowed them to record income for large projects that often took

---

[62] *Id.* at 8 ("In my professional opinion, the LVI financial statements were not presented in accordance with GAAP and were materially misstated by at least $10.9 million for the six projects analyzed in this report."). Roberts goes on to note that "after the financial statements for the two months ended February 2014 were reported, LVI (after April 2014 NorthStar) recorded incremental losses of $10.7 million through December 31, 2016 for a total loss of $21.6 million." *Id.* at 7.

[63] Dudney Report, at 58.

[64] *Id.* at 58–59.

[65] *Id.* at 58; Lenahan Aff., Ex. 4, Dep. of Louis G. Dudney, CPA/CFF ("Dudney Dep."), at 31:5–6.

more than a year to complete.[66] NCM and LVI both tracked the progress of their projects through work-in-process ("WIP") schedules.[67]

Accounting in this fashion requires estimations, which sometimes prove inconsistent with results actually achieved over time. "Fade" is a colloquial term related to POC accounting. Because earnings are recognized as a project progresses, the business does not yet know the project's final results. If the cost of completion is underestimated during the project, then the final earnings will be less than reported on the financial statements, and the project will experience "fade" as the business revises those numbers to reflect the final results. Fade can result from innocent estimation errors, or from intentional overstatement. As both parties note, fade necessarily occurs when a business fraudulently inflates its earnings to report better numbers, then "reverses" those earnings once the project reaches completion and experiences fade.

Second, GAAP permits recording some legal claims as revenue. Under GAAP, to recognize a claim as revenue, it must be probable that it will be collected.[68]

---

[66] *See* Dudney Report, at 58.

[67] *Id.* at 11 ("NCM maintained its POC accounting in work-in-process schedules . . . by-branch, by-month, and by-project. . ."); Roberts Report, at 14–34 (summarizing LVI's WIP schedules used to maintain POC accounting on six projects).

[68] Roberts Report, at 9; Lenahan Aff., Ex. 13, at ASC 605-35-25-31.

To be "probable of collection," the following conditions must be met at the time the revenue is recognized:

> (a) The contract or other evidence provides a legal basis for the claim; or a legal opinion has been obtained, stating that under the circumstances there is a reasonable basis to support the claim.
>
> (b) Additional costs are caused by circumstances that were unforeseen at the contract date and are not the result of deficiencies in contractor's performance.
>
> (c) Costs associated with the claim are identifiable or otherwise determinable and are reasonable in view of the work performed.
>
> (d) The evidence supporting the claim is objective and verifiable, not based on management's feel for the situation or on unsupported representations.[69]

If the above factors are not met, then under GAAP, the contractor should not record the claim as revenue.[70]

Third, and finally, under GAAP, a loss must be recognized when it occurs.[71] Delaying the report of a loss on financial statements is a violation of GAAP.[72]

---

[69] Lenahan Aff., Ex. 13, at ASC 605-35-25-31.

[70] *See id.* at ASC 605-35-25-87(c) ("If it is probable that the contract price will be adjusted by an amount that exceeds the costs attributable to the change order and the amount of the excess can be reliably estimated, the original contract price shall also be adjusted for that amount when the costs are recognized as costs of contract performance if its realization is probable.").

[71] Roberts Report, at 10 ("For a contract on which a loss is anticipated GAAP requires recognition of the entire anticipated loss as soon as the loss becomes evident" (quoting Lenahan Aff., Ex. 13, at ASC 605-35-25-45 through 46)).

[72] *See id.* ("[A] loss must be recognized when it is known and not delayed until a later date that may be more beneficial to a company.").

### 4. LVI's Claims against NCM, Khara, and EPP

In its original complaint, LVI sued NCM and its CEO, Subhas Khara.[73]  Later, it added NCM's major private equity owner, EPP, as a defendant, including three individuals associated with EPP—Brillon, Nibarger, and Bernardez.[74]  NCM has not moved for summary judgment of the underlying fraud allegations.  The facts that follow, therefore, focus on the involvement of EPP and Khara, both of whom have moved for summary judgment, arguing—among other things—that the evidence does not support a claim that they knew of or participated in NCM's alleged fraud.

#### a. EPP's and Khara's Roles in NCM's Accounting Practices

EPP and Khara were both involved in accounting practices at NCM from 2011 through the Merger.[75]  EPP provided high-level guidance as well as specific instructions.  NCM would, on occasion, look to EPP for direction related to creating financial statements.[76]  Khara also looked to EPP for instructions regarding financial

---

[73] Verified Compl., D.I. 1.

[74] Pl. LVI Grp. Invs., LLC's Verified Am. Compl. Against Defs., D.I. 262.

[75] EPP and Khara both argue that most of the evidence LVI proffers is irrelevant because it concerns interim financial statements (i.e. monthly or project-specific financial statements not directly connected with the Warranted Financial Statements) that do not concern the alleged fraudulent projects.  They argue that only evidence specifically connecting them to NCM's four alleged fraudulent projects are relevant to the litigation.  I decline, for purposes of these motions, to disregard evidence demonstrating the relationship between EPP, Khara, and NCM's accounting practices, as it is relevant to determining what inferences I must make for the non-moving party.

[76] Affidavit of Brian Morris, Esq. in Support of LVI Grp. Invs., LLC's Ans. Br. in Opp'n to EPP Defs.' Mot. for Summ. J., D.I. 692–98 ("Morris Aff."), Ex. 18, at NORTHSTAR18608976 (NCM CG employee writing to Brillon, "we need guidance from you and EPP of how to position the cost to complete and the imputed fade for the Oct individual WIPs. . . ."); Morris Aff., Ex. 19, at NORTHSTAR16684036 (attaching monthly financials and WIP schedules to an email to Khara,

statements.[77] In addition, EPP actively provided instructions to NCM's CFO, Duane Kerr, and others regarding adjustments to financial statements. For example, on May 12, 2012, Brillon, on behalf of EPP, told Kerr to book inventory adjustments and asked if there was "anywhere else we have room to improve April."[78] On July 4, 2012, Brillon sent Khara a spreadsheet of jobs in which both Brillon and the auditors selected jobs where "the fade that we have recognized in 2012 should be pushed back to 2011."[79] Kerr also discussed with Brillon specific approaches to creating NCM's financial statements and WIP schedules. On July 26, 2013, Kerr wrote to Brillon:

> Per our discussions, we have asked our Branch managers to take an aggressive approach to their WIP schedules. This is a departure from the relatively conservative approach that we preach to our managers. Based on this aggressive approach we may have some level of WIP fade as those jobs come to completion. However, we feel that new

noting the documents were "compiled after getting guidance from EPP (Brillon related Nibarger's instructions)."). NCM does not dispute these emails, but it notes that the employee sending them, David Whitley, was an acquired company's COO, and Brillon reviewed his work while NCM CG's accounting group was experiencing high turnover. *See* Brillon Dep., at 20:1–21:2; DiLoreto Dep., at 34:8–12, 38:21–39:12, 142:24–143:20 ("[Brillon] operated as the CFO of NCM CG for a period of time."). Hereinafter, when exhibit page numbers begin with party designations (e.g. NORTHSTAR, EPP), I include only the relevant numerals.

[77] *E.g.* Morris Aff., Ex. 22, at -83279 ("Tim w/o any reserve for Byron Claim Recovery we are at 2013 EBITDA of $20.9M with add backs. Our projected target was $21.5M[.] Dec EBITDA was $1.8M. Please advise as to how much should we reserve for Byron.").

[78] Morris Aff., Ex. 20, at -16666218 ("After booking the CG inventory is there anywhere else we have room to improve April at either DR or CG?").

[79] Morris Aff., Ex. 21, at -16662837 ("The auditors want to . . . book this reversal back into 2011 . . . the jobs in orange were selected by the auditors and I added the jobs in green. I think the jobs in green should be included in this analysis and the fade that we have recognized in 2012 should be pushed back to 2011 on these jobs as well.").

17

bookings of several large high margin jobs may help us overcome any margin fade that may occur.[80]

In addition to consulting on approaches to financial statements, Brillon often asked if the numbers reflected in the financial statements could be improved.[81]

Beyond general oversight, EPP and Khara were involved in specific accounting decisions as early as 2012. This included providing target numbers for financial statements. On November 29, 2012, after Brillon asked if there were room for improvement in the previous month's financial statements, Khara replied, "We will look at it one more time and finalize it tomorrow – is there a target number?"[82] Brillon responded, "$1.8M if it is doable without being overly optimistic."[83] Khara answered that NCM would "get aggressive on the WIP and should be able to find it in the WIP. However November may be soft due to the squeeze."[84] In December 2012, NCM sent its 2012 year-end and December numbers to EPP, and Brillon noted to Bernardez and Nibarger, "2012 EBITDA is $17.6M vs. last bank forecast of

---

[80] Morris Aff., Ex. 27, at -16706401.

[81] *E.g.* Morris Aff., Ex. 20, at -16666218 ("is there anywhere else we have room to improve April"); Morris Aff., Ex. 32, at -16644801 ("Is there any room for improvement on October?"); Morris Aff., Ex. 37, at -16639356 ("Any room to improve the Dec numbers or is this what you are comfortable with?").

[82] Morris Aff., Ex. 32, at -16644801.

[83] *Id.*

[84] *Id.*

$17.8M."[85]  Nibarger responded, "Do we have any room?"[86]  Brillon relayed this question to Khara, writing "Any room to improve the Dec numbers or is this what you are comfortable with?"[87]  Later that night, NCM sent revised numbers, with the 2012 EBITDA increased by $1.2 million to $18.8 million.[88]

EPP's and Khara's involvement in 2013 continued to affect the results shown in NCM's financial statements.  When NCM reported January 2013 EBITDA at $800,000, Brillon wrote to Khara, "[Nibarger] would like to see if you could get this closer to $1M."[89]  After further adjustments, NCM reported $1.032 million in EBITDA for January.[90]  When the next month's EBITDA initially appeared lower than expected, Kerr described to Khara his methods for adjusting the numbers:

> When I finished the [February] WIPs last night I was at EBITDA <850>.  I literally went through each branch WIP schedule and squeezed out earnings wherever I could (jobs that had substantial costs left to incur that could take reductions in cost estimate, and that weren't 100% complete or <30% complete.  I was literally squeezing out $3k here and $5k there.  I added another $250 to Mojave revenue.  All this to get to the $398 number that I'm at right now (I scrimped and scratched to pick up $1,250 – I mean, smoke was billowing out of my office!).  As you can see by the revenue number (14MM), there just

---

[85] Morris Aff., Ex. 36, at -0277715.

[86] *Id.*

[87] Morris Aff., Ex. 37, at -16639356.

[88] See Morris Aff., Ex. 38, at -0204571 (sending revised financial statements); Morris Aff., Ex. 39, at -0101394 (financer emailing questions, including inquiry about "the $18.8MM [EBITDA] actuals for FY 2012.").

[89] Morris Aff., Ex. 44, at -16633711.

[90] Morris Aff., Ex. 45, at -0110115 (reporting $1,032,313 EBITDA for January 2013).

isn't enough work to generate earnings. I just don't have the jobs left with backlog to squeeze earnings out.[91]

On March 11, 2013, Brillon notified others at EPP about half a million dollars of fade resulting from 2012 financial statements, and Nibarger responded, "That cannot happen."[92] Brillon noted the fade "is in relation to the $1.5M of found EBITDA . . . at the end of December [2012]."[93] Correspondence around this time also shows that Khara instructed branch managers to increase revenue and delay reporting losses to strengthen the financial statements.[94] When NCM reported its March EBITDA, Brillon asked, "Any chance to get this higher?" and Kerr responded, "No. This is after squeezing every last drop out of everything (and then some)."[95]

On June 27, 2013, Khara emailed Kerr and told him, "At a minimum we have to get at $1.5M [EBITDA] for May."[96] The next day, Kerr emailed Brillon to offer draft financial statements for May, which included "$1.2MM EBITDA."[97] Brillon,

---

[91] Morris Aff., Ex. 50, at -16631632.

[92] Morris Aff., Ex. 41, at -0101338.

[93] *Id.*

[94] *See* Morris Aff., Ex. 52, at -16690113 ("we need $100K of Ebitda – any room on any of your projects"); Morris Aff., Ex. 53, at -15056898 ("We are going to have some fade on AK Steel as I believe the revenue is going to be less than what is stated but due to [Khara's] instructions of wanting to finish the quarter strong we did not take the hit this month.").

[95] Morris Aff., Ex. 55, at -0203437.

[96] Aff. of Brian F. Morris, Esq. in Support of LVI Grp. Invs., LLC's Ans. Br. In Opp'n to Def. Subhas Khara's Mot. for Summ. J., D.I. 699–703 ("Morris Aff. II"), Ex. 32, at -16701438.

[97] Morris Aff., Ex. 59, at -16701751.

copying Nibarger on his response, noted that the forecast for May had been "EBITDA of $2.1M."[98]  Nibarger responded, "This cannot stand."[99]  Bernardez then instructed Brillon, "Go through the WIP today job by job with [Kerr] and [Khara] to see where we can go up.  Let's discuss the revised results on our Monday call."[100]  Later that day, Kerr sent revised financial statements, which showed May EBITDA as $2,004,773.[101]

In September 2013, Kerr sent July WIP schedule results to Khara and Brillon, attaching "a list of jobs that had substantial fade on the July WIP.  Most of these were due to aggressive WIP cost estimates in Q1 . . . There just simply isn't any room on these jobs to be any more optimistic on the cost estimates in July."[102]  In October, responding to August financial results, Brillon wrote to Khara, "is [this] the best we show for Aug, this is lower than what we were guiding the lenders to on the last lender call."[103]  Khara forwarded this email to Kerr, who sent revised numbers to Brillon less than two hours later with EBITDA increased by $275,000.[104]

---

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] Morris Aff., Ex. 62, at -16701877 (reporting that "[a]fter receiving feedback relative to the initial estimate of where numbers were coming in, we had managers re-evaluate some of their key jobs and made revised estimates to the same.").

[102] Morris Aff., Ex. 28, at -80041.

[103] Morris Aff., Ex. 78, at -60439 through 440.

[104] *Compare* Morris Aff., Ex. 77, at -14692929-003 (showing August EBITDA at $1.401,557) *with* Morris Aff., Ex. 78, at -60439 (showing August EBITDA increased to "$1.675MM").  This

Kerr warned that "if the final results on those jobs prove not to be as positive as what we are expecting there will be fade experienced at the tail end of those jobs."[105] Brillon forwarded this correspondence to Nibarger and Bernardez.[106] Two months later, reporting on October's results, Kerr wrote that although the "initial numbers were much lower," NCM "went back to the branch managers to have them go over their WIPs with a fine tooth comb for revenues and cost savings that they may not have considered."[107]

Khara continued his involvement in NCM's accounting practices into 2014 to the close of the Merger. According to the WIP schedules submitted by branch managers for February 2014, NCM showed a total loss of around $325,000.[108] Prior to submitting the financial statements, Kerr informed Khara, "February EBITDA of $1.3M is the best I could do. My first cut was only $100k."[109] Khara responded, "Please try to get it up to $1.5-$1.6M with Pepco, Teco, Duke Cape Fear, Apple, Las Vegas Courthouse. Try to pick up $50k from 5-6 large projects – this will help

---

increase included $50,000 of income on the DuPont Hickory project, discussed further below. *Id.* ("I was able to increase the August EBITDA to $1.675MM by . . . [b]ooking . . . an additional $50k of income on the Dupont Hickory Job.").

[105] Morris Aff., Ex. 78, at -60439.

[106] *Id.*

[107] Morris Aff., Ex. 81, at -83875.

[108] Dudney Report, at 55.

[109] Morris Aff., Ex. 92, at -16760591.

at closing."[110] Kerr responded, "Won't b[e] easy. Will get as close as possible."[111] The next day, Kerr wrote to Khara, "Ok. Got it to . . . EBITDA $1.5M."[112]

Finally, LVI offers evidence regarding "Blue Cell Manipulations," by which Kerr allegedly tracked the adjustments he made to excel spreadsheets submitted by branch managers by highlighting numbers that he changed.[113] The evidence does not show that Khara or EPP were involved in this practice.[114] LVI suggests, nonetheless, that the pressure—including pressure from EPP personnel and Khara—

---

[110] *Id.* In his deposition, Khara denied that in this email he was referencing the merger's closing. Morris Aff., Ex. 94, Dep. of Subhas Khara ("Khara Dep."), at 349:1–350:4 ("When I say 'closing,' it means closing of the month to budget.").

[111] Morris Aff., Ex. 95, at -16760542.

[112] Morris Aff., Ex. 93, at -16760538.

[113] *See* Dudney Report, at 116–17; *see also* Morris Aff., Ex. 107, at -11397615 ("the highlighted blue cells on the excel spreadsheet is where Brea [i.e. management] has made adjustments"). NCM employees, including Kerr, testified they had no knowledge of the practice. *See* Morris Aff., Ex. 17, Dep of Duane Kerr ("Kerr Dep."), at 54:8–55:17. LVI's expert, Dudney, estimated that the Blue Cell Manipulations showed an overstatement of EBITDA of $2.2 million for 2013 and $0.3 million for 2014. Dudney Report, at 14. While most of the alleged Blue Cell Manipulations related to the four projects at issue, Dudney also concluded that these Blue Cell Manipulations resulted in an overstatement of EBITDA related to other projects of $850,000 in 2013 and an *understatement* of EBITDA in 2014 of approximately $800,000. *See id.* at 128, table 24.

[114] LVI concedes this in its briefing. *See* LVI Grp. Invs., LLC's Ans. Br. In Opp'n to EPP Defs.' Mot. for Summ. J., D.I. 691 ("LVI Ans. Br. to EPP"), at 49 ("EPP argues that the Blue Cells were not modified by EPP. But the Blue Cells are the evidence of, and one of the mechanisms employed to effectuate, the fraud EPP participated in and directed. EPP did not need to be bookkeepers to be responsible."); LVI Grp. Invs., LLC's Ans. Br. In Opp'n to Def. Subhas Khara's Mot. for Summ. J., D.I. 698 ("LVI Ans. Br. to Khara"), at 40 n.18 ("Khara's knowledge of Kerr's method for tracking such changes [i.e. the Blue Cell Manipulations] is irrelevant. What is relevant is that Blue Cell changes were made in response to Khara's direction to 'find' more EBITDA in specified projects.").

23

to overstate NCM EBITDA inspired the adjustments represented by the Blue Cell Manipulations.

### b. EPP's and Khara's Roles in NCM's Financials Regarding the Alleged Fraudulent Projects

In contrast to the evidence showing involvement in NCM's general accounting practices, evidence showing EPP's and Khara's involvement in NCM's allegedly fraudulent projects—the Apple, Pepco, Sunoco, and DuPont Hickory projects—is limited.[115]

LVI alleges the Apple project experienced losses post-Merger because of an unreasonably low bid, unreported project delays, and aggressively underreported costs on the WIP schedules.[116] The evidence does not show that EPP or Khara directed or adjusted any financial statements related to the Apple project. Khara was involved in the project at a high level. He instructed that bidding on the project be "aggressive," but he also instructed that it should be "diligent," and "accurate."[117] He was aware of delays in the project's completion, but LVI was made aware of

---

[115] I note that NCM employees testified they had no involvement with EPP in preparing financial statements. *E.g.* Lenahan Aff., Ex. 15, Deposition of Manish Patel ("Patel Dep."), at 171:19–172:25 (denying EPP asked him to submit inaccurate financial data); Kerr Dep., at 47:9–23 (same); Lenahan Aff., Ex. 17, Deposition of Mark Canonica ("Canonica Dep."), at 116:23–117:12 (same); Ex. 18, Deposition of Scott Williams ("Williams Dep."), at 49:1–22 (same).

[116] Dudney Report, at 85–86.

[117] Morris Aff. II, Ex. 71, at -14827550 ("[W]e plan to bid this very aggressively . . . We all are very excited so let us put a strong, diligent and sincere effort to win this.").

24

these delays prior to the Merger.[118] Finally, NCM's Regional Manager, Mike Canonica, knew that delays in reporting cost increases for the project on the WIP schedules would result in fade, and he made Khara aware of this issue.[119]

LVI alleges that NCM's Warranted Financial Statements report inaccurate numbers regarding the Pepco project. No evidence suggests EPP was involved in financial statements related to the project. LVI offers one email sent by Khara that ties him to the project. In that email, Khara ordered the submission of a change order on the project with a "substantial margin on the claim to overcome shortfall in other areas," explaining in a subsequent email that it was "a good time to cover any shortfall in demolition/scrap etc."[120] After the Merger, NCM's project manager for

---

[118] *See* Morris Aff. II, Ex. 78, at -17652966 (Apple's notification of delay); Morris Aff. II, Ex. 77, at -16760368 (Khara commenting that NCM was "blindsided" by Apple's notification of delay); Transmittal Aff. of John A. Sensing to Def. Subhas Khara's Reply Br. in Support of His Mot. for Summ. J., D.I. 717 ("Sensing Aff. II"), Ex. G (LVI COO John Leonard emailing Khara, "heard that there are issues at Apple and Sunday was last day. Need any help?"); Sensing Aff. II, Ex. F, Deposition of Shrenik Vora ("Vora Dep."), at 93:10–94:5 ("[I]n March of '14 we had a notice of delay from Apple that came due . . . [LVI Employee] Mike told John Leonard about the notice of delay, and John inquired like if everything is okay. And so we set up a meeting . . . I met Mike on site, we discussed the project . . . we gave him a brief tour, he looked at everything and spoke with John Leonard on the phone, and he was pretty satisfied with everything, what he saw.").

[119] *See* Morris Aff. II, Ex. 73, at -15614872 (Canonica noting in January 2014 that "Apple has a huge increase in [costs of completion] . . . Want to update this YE WIP with projected costs so we don't take a big fade hit in Q1 2014"); Morris Aff. II, Ex. 75, at NORTHSTAR17688571 ("OUCH! Another hit coming in May . . . All WIP fade from Apple."); Morris Aff. II, Ex. 76, at -17688569 ("[Khara] is fully aware of the WIP fade.").

[120] Morris Aff. II, Ex. 51, at -17384195.

25

Pepco testified that the project's numbers on the WIP schedules were inaccurate but he did not know who had adjusted them.[121]

Regarding the Sunoco project, LVI's allegations center on the anticipated sale of a low sulfur gas furnace (the "LSG Unit"), a multi-million-dollar piece of machinery salvaged from the project site. LVI alleges that NCM fraudulently listed the sale of the LSG Unit as revenue to NCM when in fact the LSG Unit had not yet sold. Correspondence between LVI and NCM personnel shows that they discussed, prior to the Merger, treating the LSG Unit's potential sale as revenue on NCM's financial statements, despite the fact that it had not sold.[122] NCM, however, represented to LVI that it had a letter of intent covering the sale, thus justifying reporting the sale as revenue—in fact, the purported existence of an LOI was based on a statement by Khara, apparently unsupported by documentation.[123]

Khara was involved in the Sunoco project and to some extent in the sale of the LSG Unit. While an early email between NCM personnel suggested the sale of

---

[121] *See* Morris Aff. II, Ex. 79, Deposition of Jason Haller ("Haller Dep."), at 54:4–55:16 (testifying there would be no reason for changing the cost of completion as demolition had not yet commenced on the project).

[122] The evidence suggests miscommunications on LVI's part. *See* Morris Aff. II, Ex. 84, at -01981047 (CEO Scott State emailing CFO Paul Cutrone, "Still don't see how they took up revenue w/o a valid sale last year. Did we challenge that in [due diligence]?" and Cutrone replying, "We definitely covered it and ultimately accepted it," and State responding, "You should probably pull together documentation on this as it could become an issue when CHS realizes there was margin booked on $4.5MM of asset sales that weren't sold.").

[123] *Id.* (email from Cutrone stating, "[Khara] claimed to have an 'LOI to sell $5.5 mil' but I did not ask for copy of LOI at the time.").

the LSG Unit was "dead," Khara was not included on this email. [124] However, Khara was at least aware of the possibility that the LSG Unit would not be sold: he received two draft financial statements, one contemplating a sale of the LSG Unit, one without the sale included. [125] He also requested that the project manager for Sunoco confirm the WIP schedule numbers if the LSG Unit were not sold, and he then withheld part of the project manager's bonus based on the uncertainty of the sale. [126] As noted above, Khara ultimately told LVI that NCM had a letter of intent to cover the sale, but may have done so without supporting documentation. [127]

In contrast to Khara's involvement, a single email connects EPP to the Sunoco project. On April 2, 2014, Manish Patel—a member of NCM's accounting group—emailed Brillon NCM's financial statements and reported projected and actual revenue and EBITDA for the month of February 2014. [128] The financial statements

---

[124] *See* Dudney Report, at 102 (internal LVI email, not including Khara, noting "the [LSG Unit] deal is dead for Sunoco so we'll be lucky to get $16M in revenue. . ."); Sensing Aff., Ex. 62, at -15087110 (same).

[125] Sensing Aff., Ex. 63, at -16736088 (copying Khara on email stating, "Looking at $1MM fade over the next couple months assuming we DO NOT sell [LSG Unit] as we've already recognized $5MM in profit. If we can't sell, we may do better on the sale of parts and pieces so the contract value may go up from my estimate which would offset the fade.").

[126] Morris Aff. II, Ex. 82, at -16734285 (Khara asking "Duane / John what is the worst case for the Sunoco WIP if we do not sell the LSG unit?" and LVI employee Jenkins responding, "Worst case is a $1-1.25MM fade if we don't sell LSG."); Morris Aff. II, Ex. 83, at -849863 (Kerr noting in email to project manager that Khara withheld bonus "due to the uncertainty of the LSG sale.").

[127] *Id.* (email from LVI CFO Cutrone stating, "[Khara] claimed to have an 'LOI to sell $5.5 mil' but I did not ask for copy of LOI at the time.").

[128] Lenahan Aff., Ex. 22, at -16739174; *see also* Dudney Report, at 102–03.

attached to this email included numbers related to the Sunoco project, but the email did not discuss the project.[129] In other words, nothing shows that issues regarding the sale of the LSG Unit ever reached EPP.

LVI also alleges NCM fraudulently inflated earnings on the DuPont Hickory project. Some evidence shows that EPP and Khara were involved in financial statements related to DuPont Hickory. On November 26, 2012, Khara wrote to Bernardez, "Tim – we received the call for the award from DuPont estimated (with scrap) $15MM! Thanks."[130] Next, on October 1, 2013, Brillon wrote to Khara regarding NCM's August's financial results and asked, "Sage, is [this] the best we show for Aug, this is lower than what we were guiding the lenders to on the last lender call."[131] Khara forwarded this email to Kerr, and Kerr responded that he was able to increase EBITDA by, among other things, "Booking . . . an additional $50k of income on the Dupont Hickory job."[132]

---

[129] *See id.*

[130] Dudney Report, at 108 n.532; Lenahan Aff., Ex. 25, at -0102225.

[131] Morris Aff., Ex. 78, at -60439 through 440.

[132] *Id.* The parties dispute whether the alleged improper inflation was corrected (or "reversed") before the Merger. EPP points to the testimony of LVI's expert, Dudney, that the improper adjustment to the DuPont Hickory project—$282,000—was reversed out in January 2014. Lenahan Aff., Ex. 4, Dudney Dep., at 225:14–227:3. LVI contends that Kerr's $50,000 inflation described in the email above was reversed prior to the Merger, but that the remainder of the inflation, around $225,000, remained misstated at the time of the Merger and had to be reversed afterward. *See* Morris, Ex. 96, at -292329-018 (listing NorthStar "Look Back Adjustment" for 2014 financials for DuPont Hickory as "(224,040)").

28

### 5. NCM's Allegations Regarding LVI

Through discovery, NCM has narrowed its allegations regarding LVI's allegedly fraudulent practices to six projects, referred to as the Holly Street, Alcoa, HECO, Foothill, Newark, and Lafayette projects.[133] Of these projects, Holly Street, Alcoa, and HECO account for around 90% of the dollar value of the alleged fraud.[134] LVI has moved for summary judgement that it is not liable for this alleged fraud. Each project presents a unique set of facts, and so I examine the evidence regarding each of the six projects individually below.

---

[133] Perri Aff., Ex. 16, Expert Rebuttal Report of Louis G. Dudney, CPA/CFF dated May 15, 2018 ("Dudney Rebuttal Report"), at 4.

[134] Dudney Rebuttal Report, at 4 ("[NCM expert] Mr. Roberts opined that approximately 89% of the total alleged accounting misstatements relate to [Holly Street, Alcoa, and HECO projects]."). LVI LLC notes that in the Contribution Agreement, the parties listed certain projects under Schedule 1C that were subject to Change Orders or disputes with the clients, and NorthStar would be allowed to take losses resulting from settlements, up to an aggregate of $10 million, without the losses counting against EBITDA for loan covenant compliance purposes. State Dep., at 174:17-178:3 ("[Schedule 1C allowed NorthStar prospectively going forward to settle projects on this list or otherwise dispense of them, and if there were EBITDA impacts, those would not flow through as amounts that would be compared to our covenants."); Perri Aff., Ex. 3, Deposition of Paul Cutrone ("Cutrone Dep."), at 77:21–79:23 ("if, in fact, we make a business decision down the road that results in us taking an EBITDA hit or a book hit on those [Schedule 1(c)] projects, we would have the appropriate mechanism to add it back for covenant purposes."), 82:15–84:3 ("These claims [on Schedule 1C projects] were good claims. We didn't want to write them off, but if it made good business sense to settle them out in the future, we didn't want it to affect bottom line earnings."). The Holly Street and Alcoa projects were listed on Schedule 1C. Nibarger Dep., at 322:20–324:9. NCM understood prior to the Merger that a $15.6 million cash loss was possible on the Holly Street and Alcoa projects. Perri Aff., Ex. 20, at -2621641 (Brian Simmons noting that Bernardez "defines the problem as $15.6 mm of cash exposure."). LVI suggests that the evidence, combined with the presence of Holly Street and Alcoa on the Schedule 1C, suggest that NCM had notice that the Change Orders and claims associated with these projects might settle for less than what LVI sought. As NCM notes, however, the fact that the Contribution Agreement contemplated potential losses does not exculpate LVI in the case that it fraudulently misstated financials regarding the Holly Street and Alcoa projects.

29

One demolition term is important before proceeding: when a party demands additional compensation—for example, for performing work outside the original project scope, accruing unexpected costs, or when there is less scrap onsite than represented—the party seeking the additional compensation files a "contract claim." In the industry, these are referred to simply as "claims." To distinguish these claims from the legal claims that may subsequently arise out of them, I refer to these contract claims as "Change Orders."

### a. The Holly Street Project

NCM alleges LVI committed fraud regarding the Holly Street project because it entered a subcontract knowing it would be unprofitable and then inflated earnings for the project based on a lawsuit it knew was not probable of collection, as required by GAAP. Holly Street involved the abatement, decommissioning, and demolition of a power plant for the City of Austin, Texas.[135] LVI served as subcontractor to the project's general contractor, TRC.[136] Under its September 2011 subcontract, LVI would receive $11.7 million, a figure that included $3 million in cash and $8.7 million in estimated scrap value recovered from the site.[137]

---

[135] Roberts Report, at 14.

[136] *Id.* at 15.

[137] Perri Aff., Ex. 25, Subcontract with LVI Facility Services Inc. for the Holly Street Power Plant Project ("TRC Subcontract"), at -54549.

30

As the execution of the subcontract approached, LVI expressed doubts that there would be sufficient levels of copper scrap on the demolition site to realize the estimated scrap value. On March 11, 2011—six months prior to executing the subcontract—LVI wrote to TRC that it was "unlikely that there is 950,000 lbs. of copper remaining at the site."[138] The City of Austin offered to allow LVI to inspect the site for copper, but on June 22, LVI employee Michael Marcheschi warned CEO Scott State and COO John Leonard that if LVI inspected the site, it would be "conceding that [it] could verify [the scrap quantities]; we are going to get one day to find an additional 2.5 in scrap we didn't find in many days there."[139] On June 26, Marcheschi estimated that if LVI based its bid on the presence of $7.4 million of scrap value, then the Holly Street project could see as large as a $2.6 million shortfall in scrap.[140] Around this time, Marcheschi told State, "it was a bad idea to go forward with the contract with TRC."[141] Leonard was initially opposed to the contract as well until he conducted a site visit.[142]

---

[138] Lenahan Aff., Ex. 62, at -23891.

[139] Lenahan Aff., Ex. 70 at -2028581.

[140] Lenahan Aff., Ex. 106, at -8279 through 280. Marcheschi noted in this same email, however, that he had a "high degree of confidence in reducing the 'shortage' from $2.6 to $2.1" based on a site visit, and possibly reducing it further to $719,212.38 based on representations on the site owner's website. *Id.*

[141] Lenahan Aff., Ex. 71, Deposition of Michael Marcheschi ("Marcheschi Dep."), at 119:19–24.

[142] *See* Marcheschi Dep. 120:12–121:25 (testifying that Leonard was "opposed to signing the contract," but that after he visited the site and made calculations, he "thought the numbers worked.").

The next month, July 2011, TRC informed LVI that the City of Austin had indeed overstated the amount of copper at the site by 600,000 pounds, and TRC interpreted its agreement with LVI as assigning LVI the risk of a scrap shortfall.[143] LVI disagreed and warned TRC that if it signed the general contract with the City of Austin, it was "absent any contract discussions on key provisions with [LVI]."[144]

During the negotiations of the subcontract that followed, LVI and TRC adjusted the copper estimate in the subcontract downward from the City of Austin's initial representation of 950,000 pounds to 320,000 pounds.[145] LVI and TRC entered the subcontract on September 9, 2011.[146] The subcontract included a provision that

---

[143] Lenahan Aff., Ex. 59, at -4363 (TRC representative noting her "understanding of our agreement" was that "LVI has inspected the Holly Street site and is satisfied that the known scrap and salvage value at the site is at least $8,700,000. LVI will take the risk of scrap quantities and value if scrap and salvage value is less than $8,700,000.").

[144] Lenahan Aff., Ex. 59, at -4361.

[145] *Compare* Perri Aff., Ex. 26, at -23891 (March 2011 proposal suggesting 950,000 pounds of Copper) *with* TRC Subcontract, at -84549 (executed subcontract showing 320,000 pounds of Copper on Exhibit E, Scrap and Salvage schedule). I note that Schedule E on the subcontract also lists 970,000 pounds of "Copper, Motor Breakage," that LVI does not include in its calculation of an adjustment to 320,000 pounds of copper, which it appears to calculate from the sum of "Copper, Transformers, Turbines, etc." "Copper, Buss Bar, Unit #3," and "Copper Wire, Net Recovery." NCM does not seem to rebut or oppose LVI's contention that the Subcontract only estimates 320,000 pounds of Copper. *See* NCM Grp. Holdings, LLC's Response in Opp'n. to LVI Grp. Invs. LLC's Mot. for Summ. J., D.I. 686 ("NCM Ans. Br."), at 26–27 ("LVI argues . . . that the final contract between LVI and TRC reflected a lesser amount of copper, which was a result of LVI's due diligence. Yet, this argument is a red herring as the amount of copper in the contract is not at issue."). Moreover, if LVI earlier stated it was unlikely there was 950,000 pounds of copper on-site, it seems equally unlikely that it would then increase its estimation of on-site copper to 1,290,000 pounds. Based on the foregoing, I do not consider the amount of copper estimated in the TRC Subcontract—320,000 pounds—to be a disputed fact between the parties.

[146] TRC Subcontract, at -84504.

contemplated the pursuit of "a Change Order based on actual scrap quantities being less than as stated in the Project Bid Documents. . . ."[147] In other words, LVI expected that the subcontract would protect its interests by giving rise to a request for a Change Order.[148] The parties dispute whether the subcontract between TRC and LVI guaranteed a minimum total scrap value.[149]

Based on scrap shortfall that in fact occurred, as well as other issues that arose, LVI began discussing potential Change Orders with TRC more than a year before Merger discussions began.[150] On October 25, 2012, a project manager at LVI

---

[147] *See* TRC Subcontract, at -84507 ("In addition, to the extent the parties are successful in obtaining a Change Order based on actual scrap quantities being less than as stated in the Project Bid Documents, the parties shall share equally in the net proceeds of such Change Order.").

[148] State Dep. 361:7–367:24 ("We were relying on our contract with TRC and their obligations under our contract to affect certain recoveries or conditions with the City. And if in fact they breached those negotiations in our contract with TRC, that could impact the overall project, but it would not impact our ability to seek recovery either directly or through litigation.").

[149] *Compare* Perri Aff., Ex. 61, Marcheschi Dep. 71:10–24 (noting that the subcontract between LVI and TRC includes "a guaranteed minimum as far as the value of the total scrap") *and* State Dep., at 362:8–363:14 ("[The TRC Subcontract] protected our rights by giving us certainty that there were minimum thresholds [of scrap] that had to be met, and that work conditions would have to be honored for us to proceed at the price that we offered to proceed at.") *with* Lanahan Ex. 69 at -19223413 (Auditor Grant Thornton's email to LVI General Counsel noting it "had a look at the attached TRC contract and cannot see **an obligation** from the [general contractor] or the property owner on the minimum scrap value") (emphasis in original).

[150] *See* Perri Aff., Ex. 27 (March 14, 2012 notice in shortfall of Copper scrap from representation of 950,000 pounds); Perri Aff., Ex. 50 (July 9, 2012 notice of additional costs resulting from an emergency boiler abatement); Perri Aff., Ex. 51 (August 9, 2012 response from TRC confirming presence of asbestos resulting in increased costs for emergency abatement). NCM offers several emails as evidence that LVI improperly reported earnings on the project because it understood there would be a scrap shortfall. In November, David Pearson, LVI's regional manager, asked Marcheschi why cupronickel was being carried on the books. Lenahan Aff., Ex. 65, at -1631934 ("Can you refresh my memory on why we carried CuNi and how much – what do we have to support our position?"). Marcheschi told Pearson that during contract negotiations, he was told to "go back out to the site and search for more copper," despite the fact that, as noted above, LVI

emailed Leonard, informing him that Holly Street was operating at a loss of $1.9 million.[151] This figure, according to the email, excluded "the claim for copper and CuNi" shortfall.[152] With damages from potential claims and Change Orders included, the job showed a profit of $200,000.[153] Ultimately, LVI sued TRC for $9.6 million for its failure to pursue a Change Order with the site owner (the "TRC Claim").[154] LVI then discounted the claim, booking $4.9 million in revenue in 2013 based on the lawsuit.[155] LVI's auditor, Grant Thornton, concluded in its financial audit that LVI had a basis for its claim sufficient to recognize the revenue.[156]

In 2017, the court hearing the TRC Claim denied TRC's motion for summary judgment, which TRC based on the argument that LVI had accepted the risk of shortfall because it had inspected the site.[157] In 2018, NorthStar—who by that point

---

understood there was not 950,000 pounds, and in part to make up for this, it listed CuNi [i.e. cupronickel] the site owners claimed was present in on-site boilers. *Id.* at -1631933.

[151] Lenahan Aff., Ex. 66 at -25135.

[152] *Id.*

[153] *Id.*

[154] Perri Aff., Ex. 8, Dep. of Greg DiCarlo ("DiCarlo Dep."), at 84:18–85:25.

[155] *See* Perri Aff., Ex. 23, at -16733384 (presentation noting that the claim was expected to be $8 million to $10 million and recognizing revenue based upon the claim); Roberts Report, at 16.

[156] *See* Perri Aff, Ex. 29, at -303 (stating GAAP standard for recognizing revenue based on a claim and discussing the Holly Street project: "Included as an exhibit to the [TRC subcontract] is a listing of expected scrap quantities and dollar value of $8.7M which was relied on by the Company when [it] calculated the contract price, as such, the Company is entitled to be made whole for reductions in the expected scrap quantities.").

[157] *See* Perri Aff., Ex. 53, Order Denying Mot. for Partial Summ. J., and Denying Mot. to Strike, at 24–25 ("While the Contract Documents do include language whereby LVI agreed that it carefully examined the Plant conditions under which the Project was to be performed, and that it entered into the Project on the basis of its own examination, investigation, and evaluation, . . . these

owned the litigation asset—settled the claims with TRC and received a payment of approximately $2.3 million.[158]

> b. The Alcoa Project

NCM alleges LVI committed fraud regarding the Alcoa project because LVI's internal analysis, developed based on settlement offers with the site owner, showed lower gross profits and contract value than it represented in its Warranted Financial Statements. The Alcoa project was a demolition, remediation, and restoration project in Frederick, Maryland.[159] LVI and Alcoa signed the contract for the project on March 2, 2011.[160] Difficulties accrued with the project, including disputes over the scope of the work, additional costs allegedly caused by Alcoa, and interference with scrap recovery.[161]

In February 2013, LVI informed Alcoa of Change Orders based on these disputes.[162] Beginning in July, LVI and Alcoa negotiated to reduce the scope of the

---

provisions are not followed by any risk-allocation language . . . Accordingly, TRC's motion for summary judgment is denied as to its contention that LVI allocated any risk of . . . salvage shortfalls to itself pursuant to the Contract Documents.").

[158] Perri Aff., Ex. 13, Aff. of Gregory G. DiCarlo ("TRC paid LVI Facility Services, Inc. approximately $2.3 million and released its approximately $3 million in claims against that subsidiary.").

[159] Perri Aff., Ex. 4, Leonard Dep., at 166:13–18.

[160] Perri Aff., Ex. 32, Compl. in the Cir. Ct. for Frederick Cnty. MD ("Alco Compl."), ¶ 24.

[161] DiCarlo Dep., at 47:10–48:15.

[162] Perri Aff., Ex. 33 (notifying ALCOA of Change Order requests).

project and the contract value through Change Orders.[163]  LVI and Alcoa sent settlement offers based on the de-scope, and LVI developed internal analyses of the project's value and estimated gross profit based on the settlement offers.[164]  Both the settlement offers that LVI sent to Alcoa as well as the internal analyses based on these offers indicate that LVI excluded the value of its claims against Alcoa from the settlement negotiations and its internal analyses.[165]  In a "Counter offer and scope resolution" sent to Alcoa on October 28, 2013, LVI included an attachment labeled "LVI Counter Offer to Alcoa 8/28 Descope Settlement Offer."[166]  In this attachment, it proposed that Alcoa owed a contract value to LVI of $777,959.40, and it noted, "This number excludes LVI claims."[167]  In contrast to this number, LVI

---

[163] Roberts Report, at 19; Lenahan Aff., Ex. 110 (letter to Alcoa negotiating descope); Lenahan Aff., Ex. 111 (letter to Alcoa "Re.: Counter offer and scope resolution").

[164] *See* Roberts Report, at 19 ("LVI developed several internal analyses that evaluated LVI's estimated gross profit position based on offers proposed by both LVI and Alcoa relating to contract de-scope."); Perri Aff., Ex. 36 (containing internal analysis developed based on the proposed offers of each party).

[165] Though shown by documents explained below, LVI personnel also corroborated this in testimony.  Leonard Dep., at 195:22–196:14 ("Alcoa 8/29 Settlement Offer . . . doesn't include the claim that [LVI] had against them already"), 197:5–23 ("[The settlement offer] had nothing to do with the total settlement . . . we still had, obviously, a discussion regarding our entitlement on the claim"); Cutrone Dep., at 125:18–126:23 (Alcoa's settlement offer "does not contemplate additional claims that LVI was putting forth").

[166] Perri Aff., Ex. 35, at -222020-005.

[167] *Id.* ("Contract Value Owed to LVI . . . excludes LVI claims").  Notably, some of the exhibits offered by the parties differ on this issue.  NCM's exhibit leaves out the attachment (included in LVI's exhibit) sent to Alcoa advising that the settlement negotiation "excludes LVI claims." *Compare id.* (executed version including attachment at page -222020-005 noting contract value "excludes LVI claims") *with* Lenahan Aff., Ex. 111 (unexecuted version not including attachment).

developed an internal analysis that incorporated both the de-scoped project value as well as "Potential Claims," which resulted in a calculation that Alcoa owed LVI a contract value of $10,055,520.00."[168]

Ultimately, on October 4, 2013, LVI sued Alcoa, seeking $10.1 million in damages (the "Alcoa Action").[169] In November, reacting to the lawsuit, Alcoa modified the project's scope.[170] LVI's internal analyses based on the settlement offers—discussed above—showed a negative gross profit; by contrast, LVI reported a positive gross profit on its November WIP schedule and year-end 2013 WIP schedule.[171] LVI also calculated the contract value at $22.9 million on its internal analyses, but it reported a contract value of $27.4 million to its financial accountant, Grant Thornton, and on its year-end financial statements.[172]

---

[168] Perri Aff., Ex. 36, at -2002647-007.

[169] *See* Alcoa Compl., at -548354.

[170] Roberts Report, at 19; Lenahan Aff., Ex. 112 ("This letter is to inform you of Alcoa's decision to modify the existing scope of work at the Eastalcoa facility.").

[171] Roberts Report, at 19. The discrepancy between these numbers as of November 2013 was $4.3 million. *Id.* LVI updated their internal analyses in February 2014, and the discrepancy reduced to $3.8 million. *Id.*

[172] *Id.* at 19–20.; *see also* Lenahan Aff., Ex. 93, at -304.

LVI personnel testified they were confident in the claim's strength.[173] Ultimately, NorthStar settled the claim with Alcoa post-Merger for a small sum.[174]

### c. The HECO Project

NCM alleges that LVI knew profits were fading in the HECO project but fraudulently delayed recognizing those losses until after the Merger. The HECO project involved asbestos abatement, demolition, and equipment removal for Hawaiian Electric Company, Inc.[175] LVI entered the contract on December 15, 2011 and began work in 2012, but it left the job in June 2012 due to difficulties with the site owner.[176] LVI then negotiated a Change Order, executed in December 2013, and returned to work on the site.[177] New problems developed soon after LVI's return, and it began to contemplate the need for another Change Order to address new costs.[178]

---

[173] *See* DiCarlo Dep., at 56:15–57:12 ("we had a very strong basis for recovery on our claims"); Leonard Dep., at 205:7–17 ("we believed all of the CIE was recoverable").

[174] The parties dispute whether the size of the settlement indicated that the claim was originally weak or if NorthStar settled for a low value to create further business opportunities with Alcoa. *See* Leonard Dep., at 201:16–202:3; DiCarlo Dep., at 59:10–60:16.

[175] Lenahan Aff., Ex. 79, at -1543903.

[176] Lenahan Aff., Ex. 79, at -1543907; Perri Aff., Ex. 11, Dep. of Joe Catania ("Catania Dep."), at 128:7–18.

[177] Perri Aff., Ex. 37, Am. No. 4 to Major Construction Serv. Contract Between Hawaiian Elec. Co., Inc. & LVI Environmental Serv., Inc.

[178] *See* Leonard Dep., at 604:9–610:6 (describing renewed troubles on the HECO project).

LVI personnel sent several emails regarding the HECO project that NCM offers as evidence of fraud. On March 7, 2014, CEO Scott State forwarded an email to COO John Leonard about scrap prices to which he added, "Scrap starting to fade."[179] Leonard wrote back, "I know. Issue at Poletti."[180] Leonard then responded to State's email a second time, adding, "And HECO."[181] On March 11, CFO Paul Cutrone emailed personnel on the HECO project and requested that they "thin down" costs associated with accounts payable and bill payments and "push some to April" in order to "start managing quarter end balances."[182]

On the date of the Merger, Cutrone emailed Leonard and State, noting, "We have deferred margin erosion on HECO."[183] Cutrone later testified he deferred margin erosion because of the opportunity to recover based on LVI's Change Orders with the site owner.[184] Finally, in May 2014, after the Merger, Joe Catania, the

---

[179] Perri Aff., Ex. 39, at -2122048.

[180] *Id.*

[181] Perri Aff., Ex. 38, at -2122045.

[182] Lenahan Aff., Ex. 80, at -2121458 (requesting to "thin down" payments associated with "LVI AP Payment Audit List"); *see also* Perri Aff., Ex. 67, Catania Dep. 98:5–100:17 (noting that request to "thin this down" relates to postponing payments to vendors on the LVI accounts payable list).

[183] Lenahan Aff., Ex. 81 at -355683.

[184] *See* Perri Aff., Ex. 68, Cutrone Dep., at 140:5–141:25 ("the deferral is because HECO was starting to have cost overruns, and it was my understanding that we'd have margin erosion if we did not recover either operationally or through advancement of change order and/or claim with the client to recover. And until I had better clarity around that, I deferred . . . I'm expecting recovery of [the erosion] and the monetizing of that overrun either through production gains or . . . favorable change orders with the client.").

39

regional manager for the HECO project, asked Leonard if he could begin recording around $1 million total loss for the project, or "post the hit."[185] Leonard emailed back, "What?"[186] He testified his puzzlement stemmed from the fact that he expected the anticipated Change Order to give rise to claims that would keep the project profitable.[187]

After the Merger, NorthStar's CFO, Jeff Adix, opined that HECO was overstated as of December 31, 2014 because the Change Orders did not properly give rise to revenue recognition under GAAP.[188] Adix also stated, however, that he would not consider HECO overstated as of the date of the Merger due to the project's history of successfully negotiating Change Orders.[189]

### d. The Foothill Project

NCM alleges that LVI made baseless adjustments to the financial statements on the Foothill project, fraudulently inflating profits. The Foothill project was an

---

[185] Lenahan Aff., Ex. 83, at -1899392 ("Post the hit? [Cutrone] told Lenny this would be a good month for it[.] Post half? About 1mil total.").

[186] Perri Aff., Ex. 69, at -1899361.

[187] Perri Aff., Ex. 62, Leonard Dep., at 136:13–22 ("I believed, based on discussions, that we were going to put together a claim that was going to recoup all costs, plus overhead and profit from HECO.").

[188] Lenahan Aff., Ex. 84, at -2910 ("In my opinion, based on the work performed, there is substantial evidence that the 12/31/14 reported results for the HECO project were significantly overstated relative to the value of that project . . . In my opinion, the cause of the misstated HECO results was an over-reliance by the Company's former CFO on the outcome of an assumed future claim, without taking the necessary steps to fully validate a claim of this size. . .").

[189] *Id.* at -2914 through -2915.

abatement, demolition, and site clearing at the Foothill De Anza Educational Center.[190] LVI entered the contract on August 8, 2013.[191] It estimated the total contract value at $5 million, with $2.7 million in scrap value.[192]

On February 20, 2014, a regional controller emailed LVI's Northern California Branch President, Michael Kinelski, to confirm that the estimated gross profit of $461,000 reflected in the January 2014 WIP schedule was accurate.[193] Kinelski confirmed the accuracy the following day.[194] The regional controller then provided COO Leonard with the draft January WIP for Foothill on February 24, noting that "[Kinelski] forecasts the job to make 451k GP. As of Dec 2013 we reflected job to date [gross profits] of $819k. I'm in the process of finding additional [gross profits] from other Branches so we can adjust the job as of Dec."[195] LVI made upward adjustments to the WIP, and three days later the regional controller sent an email to Kinelski, noting, "We would like to adjust Foothill for Jan as follows," and showing a gross profit for the project of $878,762.[196] Kinelski responded, "Ok with

---

[190] Lenahan Aff., Ex. 88, Foothill De Anza Educational Center Demolition Work Order dated 8/8/2013.

[191] *Id.* at -436904.

[192] Lenahan Aff., Ex. 89, at -1976866; Lenahan Aff., Ex. 90 at -1912010.

[193] Lenahan Aff., Ex. 91, at -2219557 ("I see the Job by Job is reflecting Foothill with a revenue of 6.5 mil and a GP of 461k. Is this accurate? I hope not.").

[194] *Id.* at -2219556 ("Unfortunately the $460k is where it looks like we'll end up right now.").

[195] Lenahan Aff., Ex. 92, at -192009.

[196] Lenahan Aff., Ex. 95, at -2221011.

me."[197]  The final January WIP recorded gross profits of $879,000.[198]  The adjustment carried over to February, resulting in a total increase of estimated gross profits from the draft WIP schedule of approximately $418,000.[199]

At his deposition, Kinelski testified that he expected the gross profit to be $460,000, and that he could not identify a basis for the upward adjustment.[200]  LVI claims the basis for the adjustment was a potential Change Order on the project.[201]

### e. The Newark Project

The Newark project involved a partial demolition at the airport in Newark, New Jersey.[202]  NCM alleges that LVI fraudulently included revenue for the Newark project based on a claim it knew it could not collect.  LVI entered a subcontract in April 2012 with Jervis B. Webb Company for a fixed price of approximately $8.2 million.[203]  LVI began to experience operational setbacks soon after the start of the

---

[197] *Id.* at -2221010.

[198] Roberts Report, at 33.

[199] Roberts Report, at 32–33.

[200] Lenahan Aff., Ex. 94, Dep. of Michael Kinelski ("Kinelski Dep."), at 95:1–24 ("Q: [A]s of February 21 you expected the gross profit to be $460,000, correct? A: That is correct. Q: Did anything change between February 21 to March 14 which would have increased the gross profit on the job? A: Not that I can remember. Q: Had you discussed a change with anyone other than in this E-mail? A: No, I don't think so.").

[201] *See* Perri Aff., Ex. 12, Kinelski Dep., at 79:16–80:1 ("at this time we were well underway with claim at a project called the Blue Cube at Foothill . . . we were well underway and we had claims with our owner, our customer, as well as a subcontractor. . .").

[202] Leonard Dep., at 229:9–230:25.

[203] Roberts Report, at 22; Lenahan Aff., Ex. 113, at -368583 ("Contract Price $8,207,265.00").

project—prior to the Merger—and it had difficulty estimating its cost of completion.[204]

LVI increased the Newark project's revenue based on a Change Order it internally viewed as likely unsuccessful.[205] In November 2013, LVI assembled plans to file a Change Order and increased the contract value by $500,000 based on these plans.[206] The next month, LVI prepared to submit its Change Order for $640,000.[207] Along with the draft, an LVI employee wrote, "Most of this is going to be disputed and shaky at best."[208] LVI employee Bowman then sent the draft claim to COO Leonard, noting, "As discussed, not a lot of confidence in this should we actually submit but this will get you to the number."[209] Bowman then sent the

---

[204] Leonard Dep., at 231:14–233:11, 237:10–238:11; Perri Aff., Ex. 41, at -2109372 ("How the hell do we not have a clue [about cost to complete Newark project] at this point?"); Perri Aff., Ex. 56, at -2029355 ("Don't kill the messenger, I have asked every question imaginable for the last 6 months trying to get [cost to complete the Newark project] right. I don't have an answer. . .").

[205] Lenahan Aff., Ex. 96, at -2029356 (LVI President Bowman stating, "Given the contract language that I am familiar with I do not feel very confident that we will be able to have substantial success claim wise."); Lenahan Aff., Ex. 97, at -2797139 (Bowman stating "you can see by the emails attached that there isn't much confidence in any of this sticking."); Lenahan Aff., Ex. 77, Dep. of Gary Bowman ("Bowman Dep."), at 273:24–274:9 ("the contract basically allowed the customer to do whatever they wanted. . .").

[206] Roberts Report, at 22–24; *see also* Lenahan Aff., Ex. 114, at -4396600.

[207] Perri Aff., Ex. 43, at -2797142 ("Total: $640,000").

[208] *Id.* at -2797140.

[209] *Id.* at -2797139.

proposed Change Order to LVI Senior Vice President Frank Aiello, noting, "you can see by the emails attached that there isn't much confidence in any of this sticking."[210]

Bowman continued to express serious doubts about the Change Order's strength.[211] The $500,000 revenue remained on the financials through the Merger. In July 2014, Bowman told another employee that Newark was overstated by $500,000 due to the inclusion of the claim.[212] In addition, LVI personnel had been told to refrain from adding monthly costs to the Newark project as they became known, thus "freezing" the margin until after the Merger.[213] In August 2014, following the Merger, LVI circulated a forecast of Newark's results and suggested that it needed to reverse out $500,000 for the Change Order revenue by decreasing the total contract value.[214] Ultimately, LVI obtained $100,000 on the Change Order, and after the Merger it revised the contract value down by $400,000.[215]

---

[210] *Id.*

[211] Bowman Dep., at 274:3–9 ("I didn't feel as though we had the proper documentation to demonstrate that we were being held up in a way so significant that it would be worth pursuing.").

[212] Lenahan Aff., Ex. 98, at -83372 ("We have over 300,000 in WA work revenue to which the cost has hit the job but the revenue cannot be recognized since we over stated the revenue by 500,000 for the potential claim value and are now simply trying to backfill the gap.").

[213] Lenahan Aff., Ex. 98, at -83372 (Bowman noting, "We never completed adding the add'l costs we knew about many months ago, we were told to discontinue adding them each month—we would need to dig back to get specific amounts but we definitely never added the total cost that we realized we were short from months ago.").

[214] *See* Bowman Dep., at 306:2–307:7.

[215] Roberts Report, at 23; *see also* Lenahan Aff., Ex. 119 at -2288123 (reversing project value as part of Schedule 1C); Lenahan Aff., Ex. 48 (same).

f. The Lafayette Project

NCM alleges that LVI improperly delayed reporting known costs on the Lafayette project. Lafayette was an interior demolition and hazardous waste removal for historical buildings in the Washington D.C. area.[216] The branch manager for the project, David Rymers, emailed LVI's regional controller, Frank Rapuzzi, in March 2013 to identify issues concerning cost-overruns, estimation difficulties, and timing for recording losses.[217] The same month, Rapuzzi emailed CFO Paul Cutrone to inform him that the project had estimated additional costs of $300,000 that had not been recorded.[218] In September 2013, Paul Cattan, another LVI regional controller, explained that for August 2013's project results, he utilized Rymers' percent-complete numbers, except in cases where using these numbers created a decrease in revenue for the month, in which case he changed to the prior month's percentage complete, to avoid recording losses.[219] Additionally, the January 2014 job cost report contained edits adding approximately $325,283 in costs to the Lafayette project and noting the costs were "provided last month but not

---

[216] Lenahan Aff., Ex. 121, Subcontract Agreement.

[217] Lenahan Aff., Ex. 100 at -117472.

[218] Lenahan Aff., Ex. 101, at -2747540-541 ("Despite the addition of $200K in CO's as just discussed, we had to keep the job flat for the month . . . he is trying to phase it in but we have $300k issue on this job.").

[219] Lenahan Aff., Ex. 122, at -4201289 ("[Rymers] – we used your % completes except in cases that created a decrease in revenue for the month in which case I changed to the prior months % complete").

entered in Dec."[220]  Finally, in November 2014—after the Merger—Rymers stated in an email to fellow LVI employees Paul Cattan and Richard Hubbs, "Recall I had a $560k loss for [Lafayette] estimated that I wanted to project at end of 2013 and was told to reverse in dec 2013 and recognize sometime in 2014.  [] But to date we have not."[221]

### 6. Post-Merger Events

NorthStar, starting soon after the Merger, performed poorly.  Following the formation of the new company, four LVI directors served on NorthStar's seven-member board of managers.[222]  LVI's CEO, Scott State, continued on as CEO of NorthStar, while NCM's CEO, Khara, became President and a member of the NorthStar Board of managers.[223]  NorthStar experienced a personnel shakeup as it

---

[220] Lenahan Aff., Ex. 124, at -2422145.

[221] Lenahan Aff., Ex. 102, at -2526817.  LVI disputes that this loss was ever reversed.  *See* Perri Aff., Ex. 22 (Job-by-job WIP schedule containing financial information for the Lafayette project); Perri Aff., Ex. 71, Dep. of Paul Cattan ("Cattan Dep."), at 18:7–25 (testifying that a "job-by-job" WIP schedule shows the loss was not reversed, and that this WIP schedule would ultimately be reflected in the Warranted Financial Statements).

[222] *See* Sensing Aff., Ex. 1, at -16723256.

[223] *Id.* ("It is agreed that Scott State will serve as the CEO of [NorthStar], and Sage Khara will serve as President of [NorthStar].").

executed planned rearrangements following the Merger.[224]  In addition, it closed

several NCM branch offices as well as NCM's National Business Center.[225]

Problems also arose with projects post-close.  Losses and write-offs emerged

from LVI and NCM legacy projects.[226]  In addition, NorthStar entered many new

projects that saw costs in excess of expected revenue.[227]  A trough in the market

price of scrap metal led to additional declines in revenue due to lower-value resales

of scrap from demolition projects.[228]  As an added trouble, the ongoing litigation

between LVI and NCM delayed company audits, which in turn made NorthStar

---

[224] *See* Sensing Aff., Ex. 4, at -497763 ("Management is forecasting $9.3 million in potential headcount synergies from the elimination of 123 positions in the combined companies . . . Overall, the reductions assumed represent an 18.4% reduction in overall headcount levels . . . including a 40% reduction in estimators, a 35% reduction in branch managers, and a 31% reduction in sales personnel.").

[225] *Id.* ("Management is forecasting $1.5 million in annual facility savings . . . for 15 facilities to be consolidated (6 LVI and 9 NCM)"); Sensing Aff, Ex. 10, Deposition of John Kling ("Kling Dep."), at 8:15–9:5, 130:11–24 (describing the operation and closure of the NCM National Business Center); Sensing Aff., Ex. 11, Deposition of Jim Hall ("Hall Dep."), at 238:10–239:7, 241:22–242:18 (describing how post-Merger synergies shook up operations).

[226] *E.g.* Roberts Report, at 7–8.

[227] Sensing Aff, Ex. 14, at -30536 (listing "Top 20 Problem Projects – Q4-2015"); Sensing Aff, Ex. 15, at -2965 (Listing "Jobs with Contract Values > 2M In Progress as of 01/31/2015," showing many with cost in excess of revenue); Sensing Aff., Ex. 16, at -28775 (same for jobs "In Progress as of 09/30/2016"), Sensing Aff., Ex. 17, at -330721 (same for jobs "In Progress as of 3/31/16"), Sensing Aff., Ex. 18, at -29346 (same for jobs "In Progress as of 6/30/16"); Sensing Aff., Ex. 19, at 11 (same for jobs "In Progress as of 12/31/16"); Sensing Aff., Ex. 20, at 11 (same for jobs "In Progress as of 03/31/17").

[228] *See* Sensing Aff, Ex 21 (providing "Large Scrap Status Summary" indicating declining prices); Sensing Aff., Ex. 22, Deposition of Karan "Sam" Shah ("Shah Dep."), at 181:15–183:4 (testifying that drop in scrap value led to reduced profitability on NorthStar jobs); Sensing Aff., Ex. 23 (NorthStar requesting Change Order on Pepco project due to reduction in scrap value).

noncompliant with certain lending covenants and damaged its ability to secure bonds.[229] This, in turn, negatively impacted its ability to bid on new jobs.[230]

LVI and NCM put NorthStar up for sale in October 2016.[231] During the sale process, based on its business performance, NorthStar reduced its financial forecasts several times.[232] As a result, many bidders dropped out, and in June 2017, LVI and NCM sold their equity stakes in NorthStar to JF Lehman for a "zero cash equity return" for either company.[233]

---

[229] *See* Sensing Aff., Ex. 24, Deposition of Jose Carlos ("Carlos Dep."), at 48:11–50:5 (noting litigation caused delays in the audit process), 150:14–152:7 (testifying that litigation required a "lookback" audit); Sensing Aff., Ex. 25, Deposition of Robert Hogan ("Hogan Dep."), at 228:9–11 (noting lack of an audit caused LVI to fall out of compliance with loan covenants), Sensing Aff., Ex. 28, State Dep., at 467:16–468:6 (describing difficulties obtaining bonds as a result of the lack of audit); Sensing Aff., Ex. 29, Deposition of Michael Roberts ("Roberts Dep."), at 30:5–16 (explaining that absence or delay of an audit would lead to difficulty obtaining surety credit), 42:9–14 (explaining that finance company declined to provide "payment performance bonding to NorthStar" due to the audit problems).

[230] Sensing Aff., Ex. 30, at 11–12 ("[T]he delayed issuance of financial statements caused by the Investor Dispute had a negative impact on the Company's ability to bid on certain job opportunities, which led to the Company underperforming financially during the year ended December 31, 2016 and beyond. . .").

[231] *See* Sensing Aff., Ex. 9, Confidential Information Mem., prepared by Houlihan Lokey Capital.

[232] *E.g.* Sensing Aff., Ex. 34, Fund III LPAC Memo. NorthStar dated April 5, 2017, at 4 ("in late March the Company put out a revised 2017 forecast, which shows year-end EBITDA of $38.9 million, compared with original budget of $54 million.").

[233] In other words, JF Lehman purchased NorthStar for an amount less than its total debt, and LVI and NCM received nothing from the sale. *See* Sensing Aff., Ex. 36, Agreement and Plan of Merger among JFL-NGS Partners, LLC, Polaris Merger Sub, LLC, & NorthStar Grp. Holdings, LLC dated as of June 12, 2017.

*C. Procedural History*

This case has a long and somewhat tortuous procedural history. I focus only on procedure pertinent to the four motions addressed in this Memorandum Opinion.

LVI filed its original complaint on March 3, 2016, against NCM and Khara.[234] NCM responded on April 4, 2016 with a counterclaim against LVI and a third-party complaint against Scott State, Paul Cutrone, and NorthStar.[235] NCM amended its counterclaim and third-party complaint, and on August 23, 2016, LVI, State, Cutrone, and NorthStar all moved to dismiss.[236] On March 29, 2017, I granted the motions to dismiss with regard to the derivative claims but denied the motions to dismiss regarding fraud claims.[237]

On May 3, 2017, LVI filed an amended complaint, adding the EPP entities as a defendants.[238] On May 23, EPP moved to dismiss LVI's amended complaint.[239] I largely denied EPP's motion to dismiss on March 28, 2018.[240] On April 10, 2018, NCM filed a second amended counterclaim, adding LVI Parent as a counter-

---

[234] D.I. 1.

[235] D.I. 28.

[236] D.I. 118–22.

[237] D.I. 236.

[238] D.I. 262.

[239] D.I. 294.

[240] *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2018 WL 1559936 (Del. Ch. Mar. 28, 2018) (granting dismissal of the negligent misrepresentation claims and denying dismissal of other claims).

defendant.[241] Several months later, on June 29, 2018, NCM and LVI each voluntarily dismissed their indemnity claims against the other.[242] NCM, EPP, Khara, LVI, LVI Parent, and Scott State all moved for summary judgment in June and July 2018.[243] I held oral argument on the motions for summary judgment on November 28, 2018.[244]

Shortly after that argument, on December 6, 2018, NCM filed a third amended counterclaim, adding Brian Simmons, Robert Hogan, and CHS Private Equity V LP as counter-defendants.[245] The CHS counter-defendants moved to dismiss on December 20, 2018.[246] The CHS counter-defendants then moved for summary judgment on May 31, 2019.[247] After briefing completed on these latest motions, I heard oral argument on September 4, 2019 on the CHS counter-defendants motions to dismiss and for summary judgment.[248] What follows is my decision resolving the

---

[241] D.I. 627.

[242] D.I. 653. LVI explained that "LVI LLC and NCM have stipulated to dismiss their parallel claims for indemnification, because the exclusive contractual remedy relating to such claims is no longer available." LVI Grp. Invs., LLC's Mot. for Summ. J., D.I. 665, at 3 n.2.

[243] D.I. 654, 659, 664–65, 674.

[244] D.I. 781.

[245] D.I. 789.

[246] D.I. 794.

[247] D.I. 854.

[248] D.I. 888.

four motions for summary judgment filed on June 29 and 30, 2018 by NCM, EPP, Khara, LVI, and LVI Parent.[249]  My reasoning follows.

## II. ANALYSIS

Summary judgment may be granted if there is "no genuine issue as to any material fact" and the moving party is "entitled to a judgment as a matter of law."[250] The Court "must view the evidence in the light most favorable to the non-moving party."[251]  The Court must not weigh evidence and instead must "determine whether or not there is any evidence supporting a favorable conclusion to the nonmoving party."[252]  This requires the non-moving party to "set[] forth specific facts demonstrating that there is a genuine issue for trial."[253]  Of special importance in the context of claims for fraud, "[w]hen an ultimate fact to be determined is one of motive, intention or other subjective matter, summary judgment is ordinarily

---

[249] As addressed below, Defendants NCM and EPP filed their motion for summary judgment jointly, with NCM joining only in part.

[250] Ct. Ch. R. 56(c).

[251] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2017 WL 3168966, at *2 (Del. Ch. July 26, 2017) (quoting *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 1998 WL 731660, at *2 (Del. Ch. Oct. 9, 1998)).

[252] *Id.* (quoting *In re El Paso Pipeline Partners, L.P. Derivative Litig.*, 2014 WL 2768782, at *8 (Del. Ch. June 12, 2014)).

[253] *Klig v. Deloitte LLP*, 36 A.3d 785, 793 (Del. Ch. 2011).

51

inappropriate."[254] Nonetheless, when evidence of scienter is absent from the record, summary judgment may be appropriate.[255]

Regarding contracts, summary judgment is unavailable if evidence is required to resolve ambiguities; that is, if the contractual language is "fairly susceptible [to] different interpretation[s]."[256] This does not negate the fact that "the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document."[257]

*A. LVI's Motion for Summary Judgment*

LVI has moved for summary judgment on NCM's allegations of fraud and fraudulent inducement. The elements of the two claims are the same:

> (1) the defendant made a false representation; (2) the defendant knew the representation was untrue or made the statement with reckless indifference to the truth; (3) the defendant intended for the plaintiff to rely on the representation; (4) the plaintiff justifiably relied on the

---

[254] *Great Hill Equity*, 2017 WL 3168966, at *2 (quoting *Cont'l Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del. 1969)); *see also Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009) ("Where intent or state of mind is material to the claim at issue . . . summary judgment is not appropriate. In such cases, the court should evaluate the demeanor of the witnesses whose states of mind are at issue during examination at trial.") (internal quotation marks omitted).

[255] *E.g. Krahmer v. Christie's Inc.*, 2006 WL 4782304, at *4 (Del. Ch. Oct. 17, 2006) (granting summary judgment on fraud claim because of lack of evidence contradicting good faith belief in truth of statement); *Wolf v. Magness Constr. Co.*, 1994 WL 728831, at *5 (Del. Ch. Dec. 20, 1994) (granting summary judgment because of lack of evidence suggesting a knowing or reckless misrepresentation).

[256] *ITW Glob. Invs. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.*, 2017 WL 1040711, at *6 (Del. Super. Ct. Mar. 6, 2017) (quoting *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012)).

[257] *Id.* (quoting *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 336 (Del. 2012)).

representation; and (5) the plaintiff suffered causally related damages.[258]

In the Contribution Agreement, LVI represented that the Warranted Financial Statements disclosed the financial position of its businesses in accordance with GAAP.[259] NCM's allegations of fraud regarding six LVI projects center largely on two GAAP violations: (1) reporting claims or Change Orders as revenue when they were not probable of collection, and (2) delaying reporting losses when the losses were known.[260] To survive this motion for summary judgment, therefore, NCM must offer some evidence from which I may conclude that (1) the Warranted Financial Statements were not GAAP compliant, (2) LVI *knew* they were not GAAP compliant, and (3) LVI nonetheless intentionally offered them to induce NCM's reliance (in this case, to enter the Merger).

---

[258] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 807 (Del. Ch. 2014) (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983); *In re Wayport, Inc. Litig.*, 76 A.3d 296, 323 (Del. Ch. 2013); *Paron Capital Mgmt., LLC v. Crombie*, 2012 WL 2045857, at *5 (Del. Ch. May 22, 2012)).

[259] Contribution Agreement, § 3.4(b).

[260] The GAAP standards for these two rules are stated in the facts and reiterated here. To be "probable of collection," the following conditions must be met at the time of revenue recognition: (1) the contract or other evidence provides that a legal basis for the claim or a legal opinion has been obtained; (2) additional costs are unforeseen and not the result of deficiencies in contractor performance; (3) costs associated with the claim are identifiable and reasonable; and (4) the evidence supporting the claim is objective and verifiable, not based on management's feel. Roberts Report, at 9; Lenahan Aff., Ex. 13, at ASC 605-35-25-31. Under GAAP, a loss must be recognized when it occurs. Roberts Report, at 10.

Each of the six LVI projects presents a unique set of facts and operates as a motion-in-miniature. As noted above, for the purposes of deciding the motion, I view the facts in the light most favorable to NCM, not weighing the evidence but drawing all reasonable inferences in its favor. In discussing the projects and the related allegations of fraud below, I will not repeat a full description of each project, which is provided in the Background section of this Memorandum Opinion in dolorous detail. Based on a review of the projects, I find summary judgment is warranted on the Alcoa project, and it is not warranted for the Holly Street, HECO, Foothill, Newark, and Lafayette projects. My reasoning follows.

### 1. The Holly Street Project

In the Holly Street project, LVI subcontracted the demolition of a power plant in Texas. When a scrap shortfall occurred, LVI sued the general contractor for $9.6 million and—relying on the value of this lawsuit—booked revenue of $4.9 million. LVI's fraud, according to NCM, is that it knew this claim was not probable of collection because it anticipated the scrap shortfall beforehand.

The parties agree on most of the facts. LVI anticipated a shortfall early on and remained skeptical about the amount of scrap. By July 2011, the site owner admitted scrap was overstated, but the general contractor nonetheless entered a contract with the site owner. LVI negotiated its subcontract to reflect a reduced—and more realistic—amount of scrap on the site and to contemplate a Change Order

in the event of what by that point was an anticipated scrap shortfall.[261] When the shortfall occurred, the general contractor refused to pursue a Change Order with the site owner, and LVI sued the general contractor under the subcontract for this failure. At the end of 2013, LVI's financial auditor concluded that LVI had a basis sufficient under GAAP to recognize revenue from the claim.[262]

The parties disagree on several facts, however, and drawing conclusions in NCM's favor, as I must, I find three disputed facts material, precluding summary judgment here. The parties' disagreements center on the strength of LVI's claim and the contractual protections afforded by the subcontract. First, the parties disagree over whether the subcontract provided LVI with a guaranteed minimum value of scrap. NCM points out that LVI's auditor told it shortly before the Merger that it reviewed the subcontract and did not see "an obligation" of minimum scrap value from the general contractor or the site owner; by contrast, LVI personnel all testified that the subcontract *did* provide a guarantee minimum scrap.[263] Second, the

---

[261] *Compare* Perri Aff., Ex. 26, at -23891 (March 2011 proposal suggesting 950,000 pounds of Copper) *with* TRC Subcontract, at -84549 (executed subcontract showing 320,000 pounds of Copper on Exhibit E, Scrap and Salvage schedule).

[262] *See* Perri Aff, Ex. 29, at -303 ("Included as an exhibit to the [TRC Subcontract] is a listing of expected scrap quantities and dollar value of $8.7M which was relied on by the Company when [it] calculated the contract price, as such, the Company is entitled to be made whole for reductions in the expected scrap quantities.").

[263] *Compare* Perri Aff., Ex. 61, Marcheschi Dep. 71:10–24 (noting that the subcontract between LVI and TRC includes "a guaranteed minimum as far as the value of the total scrap") *and* State Dep., at 362:8–363:14 ("[The TRC Subcontract] protected our rights by giving us certainty that there were minimum thresholds [of scrap] that had to be met, and that work conditions would have to be honored for us to proceed at the price that we offered to proceed at.") *with* Lenahan Aff., Ex.

parties disagree over whether the subcontract gave LVI a firm basis to pursue a Change Order, when the general contractor's agreement with the site owner did not guarantee a Change Order in case of a shortfall. In other words, did LVI enter its subcontract knowing that when the shortfall occurred, the general contractor would be obliged to pursue a Change Order with the site owner *without* a contractual basis with the site owner on which to rely? Third, the parties dispute whether LVI assumed the risk of a shortfall in the subcontract. While post-merger litigation shows the subcontract did not clearly allocate the risk, this only reinforces the conclusion that at the time it entered the subcontract, LVI did so without a clear contractual right to avoid such a risk.

These three disputes raise factual issues of whether LVI booked the revenue in good faith or whether it booked the revenue despite a belief that it did not have the contractual or legal protections to vindicate its claim, in order to induce a favorable merger. These disputed facts ultimately go to whether LVI had knowledge of an improper financial statement and nonetheless represented otherwise to NCM.

While the evidence suggests—and LVI's testimony and the opinion of its auditor corroborates—that there may have been ample basis to support its representations, I cannot as a matter of law disregard the facts tending to prove

_____

69 at -19223413 (Auditor Grant Thornton's email to LVI General Counsel noting it "had a look at the attached TRC contract and cannot see **an obligation** from the [general contractor] or the property owner on the minimum scrap value") (emphasis in original).

otherwise. In other words, the inferences from which I conclude that NCM may prove this claim are weak, but sufficient.

### 2. The Alcoa Project

In the Alcoa project, LVI contracted for demolition work at Alcoa's site in Frederick, Maryland. This project was contentious, leading to LVI's claim that Alcoa had violated its contract with LVI in a variety of ways and that Change Orders were due. After LVI sued Alcoa, it showed the project as profitable on its financial statements. By contrast, internal analyses based on settlement offers with Alcoa stated a number that showed the project at a loss. NCM argues this discrepancy shows an intentional inflation of earnings that amounts to fraud. Nonetheless, the undisputed facts show that LVI is entitled to a judgment.

Following the commencement of its lawsuit against Alcoa seeking $10.1 million, LVI recorded a total contract value on its 2013 year-end financial statements of $27.4 million with $3 million in gross profit.[264] LVI's internal analyses showed a contract value of $22.9 million, with a negative gross profit. The settlement offers sent to Alcoa reflect this lower value, but when stating the "Contract Value Owed to LVI," one of the offers specified that this amount "excludes LVI claims."[265] This suggests that the internal analyses based on these settlement offers also excludes the

---

[264] Roberts Report, at 19–20.; *see also* Lenahan Aff., Ex. 93, at -304.

[265] Perri Aff., Ex. 35, at -222020-005 ("Contract Value Owed to LVI . . . excludes LVI claims").

57

value of the claims. This conclusion is corroborated by a further internal analysis that adds the reduced project value together with LVI's potential claims and shows a contract balance due from Alcoa of $10,055,520.[266] NCM contends this internal analysis cannot support summary judgment because "[t]here is no evidence that the numbers in that document had any basis in fact or any verifiable support."[267] Countering the veracity of the numbers, however, does not create a material dispute that anything other than the exclusion of LVI's claims against Alcoa caused the discrepancy between the year-end financial statements on the one hand, and the settlement offers and the internal analyses based on those offers on the other hand. Even viewing the evidence in the light most favorable to NCM, I find this to be the reasonable conclusion.

NCM contends that even if the discrepancy is explained by LVI's claim, there remains a question of fact about whether the accounting for the claim was proper. But this does not raise a material fact about whether LVI committed fraud. NCM does not offer any evidence that anyone at LVI doubted the strength of its claim or any evidence that they should have doubted it; in fact, the evidence suggests that LVI personnel, including its General Counsel, believed in the claim's strength.[268] In

---

[266] Perri Aff., Ex. 36, at -2002647-007.

[267] NCM Ans. Br., at 34.

[268] See DiCarlo Dep., at 56:15–57:12 ("we had a very strong basis for recovery on our claims"); Leonard Dep., at 205:7–17 ("we believed all of the CIE was recoverable").

sum, even viewing the facts in the light most favorable to NCM, there is no evidence presented that suggests an improper inflation of gross profits or contract value. Nor is there evidence presented that suggests reporting the lawsuit as revenue on the year-end financial statements not only violated GAAP, but from which I may infer that LVI *knew* it violated GAAP and offered it to NCM nonetheless.

### 3. The HECO Project

The HECO project required LVI to demolish a power plant in Hawaii, and the contract price included scrap value estimates that were not fulfilled. NCM offers four email exchanges as evidence of fraud on the HECO project, arguing that LVI understood the project to be a loss but nonetheless deferred the loss until after the Merger. While the evidence is scant, it nonetheless creates an issue of material fact. Resolving that factual issue in favor of NCM, I cannot say, as a matter of law, that fraud is precluded.

In the first exchange, CEO Scott State wrote to COO John Leonard, "scrap starting to fade"; Leonard wrote back, "I know. Issue at Poletti"; then Leonard responded again, adding, "And HECO."[269] This is not, as NCM argues, an ambiguous exchange. Leonard's first response notes that fading scrap prices are an issue at Poletti. His second email notes that fading scrap prices are also an issue at HECO. NCM's interpretation—that Leonard was signaling not only that HECO

---

[269] Perri Aff., Ex. 39, at -2122048.

59

financials were fading but also that he understood LVI would be operating at a loss with respect to HECO—unreasonably stretches the evidence. I do not find that this evidence implies fraud on the part of LVI. Likewise, in the second email exchange, LVI's CFO, Paul Cutrone, requested that costs be "thinned down" and pushed to April, but this fails to imply fraud.[270] This email related to accounts payable and cash flow, and there is no indication that it affected revenue reporting.

The final two email exchanges, however, viewing the evidence in the light most favorable to NCM, create issues of material fact, if narrowly, that preclude summary judgment. Cutrone wrote to Leonard and State on the date of the Merger, "We have deferred margin erosion on HECO."[271] Following the Merger, LVI employee Joe Catania asked Leonard if he could "post the hit," meaning record around $1 million total loss for the HECO project that had been deferred.[272] LVI argues that Leonard's one-word response—"What?"—is exculpatory, but I find it insufficient to establish that Leonard expected in good faith that anticipated claims would keep the project profitable.[273] Similarly, Cutrone's later deposition testimony

---

[270] Lenahan Aff., Ex. 80, at -2121458 (requesting to "thin down" payments associated with "LVI AP Payment Audit List").

[271] Lenahan Aff., Ex. 81, at -355683. LVI points out that this email concerns financials for the first quarter of 2014, including March 2014, but deferred margin erosion arguably concerns margin erosion that went unreported at an earlier date, potentially during the period covered by the Warranted Financial Statements.

[272] Lenahan Aff., Ex. 83, at -1899392.

[273] Perri Aff., Ex. 69, at -1899361.

that he deferred margin erosion because of the opportunity to recover based on LVI's claim, on a cold record, is insufficient to resolve a factual dispute over whether LVI knew it had losses on the HECO project and intentionally delayed stating them on the financials until after the Merger.

These latter two exchanges, again narrowly, create an issue of material fact about whether LVI knew about a loss prior to the merger but intentionally delayed reporting it in violation of GAAP. Thus, as a matter of law, I cannot grant summary judgment.

### 4. The Foothill Project[274]

The Foothill project required LVI to demolish a school. NCM argues that LVI intentionally and artificially inflated gross profits for the Foothill project on the January 2014 WIP, which then improperly carried over into the Warranted Financial Statements ending in February 2014. The parties cite to different parts of the record and construe email exchanges in different ways, but the evidence shows a dispute of material fact that precludes summary judgment on the Foothill project.

---

[274] LVI argues that summary judgment is warranted for these last three projects—Foothill, Newark, and Lafayette—because any fraudulent misstatements could not have been large enough to be material to NCM's decision to enter the merger. This is, at the very least, disputed for two reasons NCM outlines. First, NCM's expert testified to the materiality of these projects. *See* Lenahan Aff., Ex. 74, Roberts Dep., at 231:9–16. Second, although the amounts may be smaller compared with the other projects, they form a portion of NCM's total claim for a misstatement of $10.9 million, a material figure.

The record shows that LVI employee Michael Kinelski received the first draft for the January WIP schedule from a regional controller, and he approved numbers reflecting a gross profit of $460,000.[275] These numbers were passed on to COO Leonard.[276] Someone at LVI—the record is unclear who—made a significant upward revision to the gross profit in the WIP schedule.[277] The regional controller sent a second draft to Kineslki, writing, "We would like to adjust Foothill for Jan as follows," and this draft stated gross profits of $878,762.[278] Kinselski approved the numbers, writing back, "Ok with me."[279]

The disputed material fact is whether there was any basis for the adjustment. LVI states the basis for the adjustment was a Change Order, and it cites to Kinelski's deposition. In the passage LVI cites, Kinelski is discussing emails between himself and the regional controller dated July 16, 2014: "at this time we were well underway with claim at a project called the Blue Cube at Foothill . . . we were well underway and we had claims with our owner, our customer, as well as a subcontractor. . ."[280] LVI does not offer evidence, however, showing that the Foothill Change Orders

---

[275] Lenahan Aff., Ex. 91, at -2219557.

[276] Lenahan Aff., Ex. 92, at -192009.

[277] Lenahan Aff., Ex. 95, at -2221011.

[278] *Id.*

[279] *Id.* at -2221010.

[280] Perri Aff., Ex. 12, Kinelski Dep., at 79:16-80:1.

discussed in Kinelski's deposition regarding emails sent in July 2014 served as the basis for the adjustment to gross profit in the January and February WIP schedules. It is unclear whether these later emails explain or relate to the adjustments. NCM, in turn, cites to another passage in Kinelski's deposition in which he states he did not know who adjusted the profits from $460,000 to $878,000, that he had not expected such a change, and that he was unaware of any changes on the Foothill project that would have given rise to the adjustment.[281]

In sum, while a factfinder might agree with LVI that the adjustment was part of a healthy give-and-take over numbers, the parties have a dispute of material fact as to whether the adjustment to gross profits for Foothill had any basis to justify it. Resolving this issue in favor of NCM, it is reasonable to infer that LVI knew it was an artificial inflation that could not be achieved, and nonetheless fraudulently stated the inflated figure in its Warranted Financial Statements.

### 5. The Newark Project

The Newark project involved an LVI contract to demolish airport baggage-handling equipment. The undisputed evidence shows that LVI recorded revenue of $500,000 based on a planned Change Order.[282] LVI personnel on the project saw

---

[281] Lenahan Aff., Ex. 94, Kinelski Dep., at 94:16–95:24.

[282] Roberts Report, at 22–24; *see also* Lenahan Aff., Ex. 114, at -4396600.

the claim as shaky, unfounded, and unlikely to stick.[283] They communicated this message, but the revenue nonetheless remained on the financial statements until after the Merger, at which time LVI reversed its value by $400,000.[284] LVI essentially argues that because the Newark job team "was failing spectacularly," their judgment on the claim's worth was suspect and reasonably omitted from the financial reporting. That is one inference, but the instant motion requires me to consider another; the inference that LVI maintained the revenue despite a clear message from its employees closest to the project that the claim was not as valuable as reported. An issue of material fact remains as to whether LVI intentionally maintained artificially inflated revenue until after the Merger, and thus *knew* its Warranted Financial Statements violated GAAP.

### 6. The Lafayette Project

LVI undertook the Lafayette project in connection with renovation of historic properties in the District of Columbia. The parties dispute four material facts about whether LVI intentionally misstated its financial statements, thus precluding summary judgment for the Lafayette project. First, LVI employee Rappuzi emailed CFO Paul Cutrone in March 2013 and told him that the project had incurred

---

[283] Lenahan Aff., Ex. 96, at -2029356; Lenahan Aff., Ex. 97, at -2797139; Lenahan Aff., Ex. 77, Bowman Dep., at 273:24–274:9.

[284] Roberts Report, at 23; *see also* Lenahan Aff., Ex. 119 at -2288123 (reversing project value as part of Schedule 1C; Lenahan Aff., Ex. 48 (same).

$300,000 in unreported costs.[285] The parties dispute whether the Warranted Financial Statements properly reflect these known costs. Second, in August 2013, another LVI employee, Cattan, stated that he was switching accounting methods with the intent to show more revenue.[286] The parties dispute whether this caused the improper reporting of revenue on the financial statements. Third, $325,000 in costs for December 2013 were not reported until January 2014 without explanation, which affected the 2013 Warranted Financial Statements.[287] Fourth and finally, yet another LVI employee, Rymers, testified that he was instructed to reverse a known loss at the end of 2013 and delay reporting it until 2014. The parties dispute whether Rymers followed these instructions, and thus whether this known loss was intentionally delayed until after the Merger.[288]

Thus, the parties disagree about whether known costs went unreported, whether LVI personnel intentionally manipulated accounting methods to artificially inflate profits, whether an unexplained delay in reporting over $325,000 in costs had any basis, and whether LVI improperly and intentionally delayed reporting an

---

[285] Lenahan Aff., Ex. 101, at -2747540-541.

[286] Lenahan Aff., Ex. 122, at -4201289.

[287] Lenahan Aff., Ex. 124, at -2422145.

[288] As noted in the factual recitation, LVI attempts to show the loss was not improperly reversed by pointing to "job-by-job" reports showing the loss was reported. *See* Perri Aff., Ex. 22; Perri Aff., Ex. 71, Cattan Dep., at 18:7–25. The parties, however, also dispute whether these "job-by-job" reports are reflected in the Warranted Financial Statements. *See* NCM Ans. Br., at 53.

additional $560,000 in costs. LVI's argument that these "minor alleged discrepancies" may not even have been reviewed by LVI senior management does not warrant summary judgment when NCM has offered evidence that could create, at this stage, an inference of intentional improper misstatement of financials.

*B. NCM and EPP's Motion for Summary Judgment*

EPP has moved for summary judgment on LVI's claims for fraud, fraudulent inducement, conspiracy to commit or aiding and abetting fraud, and unjust enrichment.[289] NCM joins EPP's motion as it relates to the timeliness of LVI's fraud claims. NCM has not moved for summary judgment on the underlying allegations of fraud against it.

### 1. LVI's Fraud Claims are not Time-Barred

NCM joins with EPP in arguing that LVI's fraud claims are not timely under a plain reading of the Contribution Agreement. At the summary judgment stage, "the intent of the parties as to [a contract's] scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document."[290] Summary judgment is only denied if the contractual language is

---

[289] I dismissed LVI's claim against EPP for negligent misrepresentation in my decision of March 29, 2018. *See LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2017 WL 1174438 (Del. Ch. Mar. 29, 2017).

[290] *ITW Glob. Invs. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.*, 2017 WL 1040711, at *6 (Del. Super Ct. Mar. 6, 2017) (quoting *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 336 (Del. 2012)).

"fairly susceptible [to] different interpretation[s]," requiring evidence to resolve ambiguities.[291] Moreover, "Contract terms are not ambiguous merely because the parties to the contract disagree."[292]

NCM and EPP base their argument on § 5.1(c), "Timing of Claim," a provision that relates to the survival of the representations and warranties for the Warranted Financial Statements. That section provides:

> Notwithstanding the foregoing in this Section 5.1, any representation or warranty in respect of which indemnity may be sought under Section 5.2 below, and the indemnity with respect thereto, will survive the time at which it would otherwise terminate pursuant to this Section 5.1 if notice of the inaccuracy or breach or potential inaccuracy or breach thereof giving rise to such right or potential right of indemnity will have been given to the party against whom such indemnity may be sought prior to such time (regardless of when the Losses in respect thereof may actually be incurred).[293]

According to the Defendants, this provision permits the survival of indemnity claims only. Under the Defendants' argument, the provision's express references to indemnity—particularly, "and the indemnity with respect thereto"—mean that the provision only allows the survival of indemnity claims. For all other causes of action, the representations and warranties expire. If the parties wanted other causes of action to survive, the Defendants argue, they would have said so by including a

---

[291] *Id.* (quoting *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012)).

[292] *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007).

[293] Contribution Agreement, § 5.1(c).

phrase such as "and all other remedies with respect thereto" rather than "and the indemnity with respect thereto."

LVI, by contrast, argues that this misses the point of § 5.1(c). The provision, it argues, is cumulative: if notice of inaccuracy or breach is timely filed, then the representations and warranties survive, and the related indemnity also survives. If the parties meant for other remedies to expire, they would have said so.

I do not find the contract ambiguous. Section 5.1(c) concerns the survival of representations and warranties. It defines the scope of the representations and warranties as those "in respect of which indemnity may be sought."[294] It also provides that the indemnity itself will survive with the representations and warranties.[295] I read the provision as doing exactly what it purports to do, and nothing more. The fact that the parties did not mention fraud cannot be read as an intent to cause potential fraud claims to expire. In other words, the warranties have not expired, and if those warranties were fraudulent, a fraud action remains contractually viable.

The language in the Contribution Agreement's remedies clause treats fraud separately from indemnification. That provision limits remedies to "(i) the indemnification provisions contained in this <u>Article 5</u>, (ii) the provisions of <u>Section</u>

---

[294] Contribution Agreement, § 5.1(c).

[295] *Id.* (". . . and the indemnity with respect thereto. . .").

<u>5.6</u> [specific performance] and (iii) claims for fraud against the Person who committed such fraud."[296] In other words, fraud is not contained by the Contribution Agreement in the same way indemnification and specific performance are, nor does the contract limit fraud claims to the parties to the Agreement. Given this treatment, the explicit extension of the right to indemnification upon notice of a claim is necessary to preserve that right. As such, it does not imply an intent to extinguish fraud claims based on the warranties. Section 5.1(c) does not imply a positive intent to extinguish the otherwise-broad remedy for fraud and preserves fraud actions based on the representations and warranties thereby preserved.

In sum, § 5.1(c) operates to preserve the representations and warranties if notice is timely given, and it also preserves the indemnity related to those representations and warranties. I find that the parties did not express the intent, in light of the contract as a whole, to extinguish the fraud cause of action by leaving it out of the survival clause in § 5.1(c). Therefore, summary judgment on this argument is denied.

---

[296] *Id.* § 5.4(e).

## 2. EPP is Entitled to Summary Judgment for Fraud and Fraudulent Inducement

"The elements of fraudulent inducement are the same [as] those of common law fraud."[297] As I have described, to demonstrate fraud, a plaintiff must show:

> (i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages.[298]

EPP's motion does not seek summary judgment on the underlying fraud allegations against NCM; rather, EPP argues that summary judgment is warranted because the evidence does not show that it made or caused NCM to make the false representations, and thus LVI cannot show that *EPP* committed fraud with regard to the Merger.

LVI's evidence regarding EPP falls generally into two buckets. The first bucket is evidence purporting to show that EPP played a high-level role in NCM's accounting practices and participated in or directed earnings mismanagement. The second bucket is evidence purporting to show that EPP played a role in the Warranted Financial Statements or in the financials associated with the four alleged fraudulent projects. To put it plainly, the first bucket is heavy, and the second bucket

---

[297] *Smith v. Mattia*, 2010 WL 412030, at *5 n.37 (Del. Ch. Feb. 1, 2010).

[298] *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015) (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).

is light. EPP argues that I should entirely disregard any evidence that does not specifically tie EPP to those four projects or the Warranted Financial Statements. I disagree: the evidence regarding EPP's general role in NCM's accounting practices is circumstantial evidence that is relevant, particularly with respect to the inferences that I must draw at this stage of the proceedings.

I find that LVI does not meet its burden to put forward evidence on the first prong of fraud, in other words, to show that EPP made a false representation. After I denied EPP's earlier Motion to Dismiss this claim, the parties engaged in extensive discovery, but even after discovery, the record does not contain any evidence showing that EPP—a separate entity from NCM—made or directly caused NCM to make the false representations at issue in this litigation. Therefore, as a matter of law, the evidence does not support a claim for fraud against EPP.[299]

---

[299] As the parties note, I denied EPP's Motion to Dismiss on March 28, 2018, finding that LVI adequately alleged a claim of fraud, and that the fact that "the representations and warranties in the agreement were made by NCM, not [EPP] . . . is not fatal to LVI's fraud claims." *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2018 WL 1559936 (Del. Ch. Mar. 28, 2018). I based that finding on the public policy against allowing parties to limit their exposure for fraudulent activity. *See Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A2d 1032, 1064 (Del. Ch. 2006); *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 61 (Del. Ch. Nov. 24, 2015). Having reviewed the evidence after substantial completion of discovery, I find LVI's fraud claim lacking. However, because I deny summary judgment of the conspiracy claim against EPP below, EPP faces potential liability for their association with NCM's allegedly fraudulent activities, but as conspirators, not fraudsters.

71

3. <u>EPP is not Entitled to Summary Judgment for Conspiracy to Commit or Aiding and Abetting Fraud and Fraudulent Inducement</u>[300]

In contrast to fraud, conspiracy does not require showing a false representation by the defendant.[301] Instead, it requires showing "(1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff."[302] Conspiracy is an intentional tort, and therefore it requires some evidence regarding scienter by EPP.[303] EPP argues for summary judgment on the conspiracy claim because it contends there is no evidence of an intentional agreement between it and NCM. A conspiracy claim, however, does not require LVI, even at trial, "to prove the existence of an explicit agreement."[304] Rather, a claim for conspiracy can rely on circumstantial evidence from which a reasonable

---

[300] LVI pled aiding and abetting fraud as an alternative to conspiracy to commit fraud. *See* Pl. LVI Grp. Invs., LLC's Verified Am. Compl. Against Defs., D.I. 262, ¶¶ 122–36. The parties have not briefed the alternative aiding and abetting claim, and because I find summary judgment is not warranted on the conspiracy, I do not reach the alternative claim.

[301] In my Decision of March 29, 2018, I rejected the argument from EPP that the exclusive remedies clause in § 5.4(e) of the Contribution Agreement prohibited a conspiracy claim based on the principle that "where a conspiracy exists, the acts of each co-conspirator with respect to the aim of the conspiracy are attributable to the acts of the other co-conspirators under a theory of agency," and thus "all members of a conspiracy to commit fraud have committed such fraud." *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2018 WL 1559936, at *14 (Del. Ch. Mar. 28, 2018).

[302] *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006).

[303] *Binks v. DSL.net, Inc.*, 2010 WL 1713629, at *11 (Del. Ch. Apr. 29, 2010).

[304] *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 806 (Del. Ch. 2009).

factfinder can conclude there was an agreement.[305] Similarly, intent can be inferred from circumstantial evidence.[306]

LVI offers significant circumstantial evidence of EPP's involvement with NCM's accounting, and I find that, taken as a whole, this evidence is sufficient to support its claims for a conspiracy to commit fraud. I will not recount the evidence in detail, which is set out in full in the Background section of this Memorandum Opinion. Viewing the evidence in the light most favorable to LVI, as I must for this motion, the proffered evidence leads to a reasonable conclusion that EPP was involved in earnings mismanagement related to NCM's accounting practices. Moreover, EPP exerted influence over those practices. It guided NCM on how to approach WIP schedules.[307] On more than one occasion, it requested additional EBITDA or provided targets and watched NCM's numbers morph to comply with its requests, sometimes over the course of just a few hours.[308] It instructed when revenues and fade should be recognized.[309] When EPP expressed displeasure over

---

[305] *See* i*d.*

[306] *ITW Glob. Invs. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.*, 2017 WL 1040711, at *8 (Del. Super. Ct. Mar. 6, 2017) (quoting *Goldsborough v. 397 Props., LLC*, 2000 WL 33110878, at *2 (Del. Super. Sept. 29, 2000)). While *ITW Glob.* involved fraud claims, I find the principle regarding circumstantial evidence equally applicable to a conspiracy to commit fraud.

[307] Morris Aff., Ex. 27, at -16706401 (email from Kerr to Brillon, noting, "Per our discussions, we have asked our Branch managers to take an aggressive approach to their WIP schedules.").

[308] *See* Morris Aff., Ex. 20, at -16666218; Morris Aff., Ex. 32, at -16644801; Morris Aff., Ex. 59, at -16701751; Morris Aff., Ex. 62, at -16701877.

[309] Morris Aff., Ex. 21, at -166662837.

73

the numbers, results were nearly instantaneous.[310] I conclude that evidence is sufficient to draw the inference that EPP knew of the allegedly-fraudulent financial representations related to the Merger, and that it assisted or agreed with NCM to induce LVI's reliance thereon.

To the extent EPP denies the evidence shows that it engaged in any earnings mismanagement, this in itself creates a dispute of material fact about EPP's relationship to NCM's accounting practices.[311] Importantly, EPP engaged in the creation of NCM accounting practices of the very kind alleged with relation to the projects at issue in this litigation. In addition, while EPP argues that there is no indication that any of its involvement in NCM's accounting affected the Warranted Financial Statements, this is also a disputed material fact. LVI's expert, Dudney, did not expressly point to misstatements in the Warranted Financial Statements traceable to EPP's involvement. LVI argues, however, that logically any improper

---

[310] *See* Morris Aff., Ex. 59, at -16701751 ("This cannot stand"); Morris Aff., Ex. 41, at -101338 ("That cannot happen.").

[311] EPP also points to the across-the-board denials by NCM employees that they ever received instructions from EPP to manipulate financial statements. Lenahan Aff., Ex. 15, Patel Dep., at 171:19–172:25 (denying EPP asked him to submit inaccurate financial data); Lenahan Aff., Ex. 17, Canonica Dep., at 116:23–117:12 (same); Lenahan Aff., Ex. 18, Williams Dep., at 49:1–22 (same). The evidence offered, however, shows that EPP contained its involvement to interactions with executives like CEO Khara and CFO Duane Kerr, and so the testimony by NCM employees serves only to further establish a material dispute.

delay of fade until a project's completion would translate into a misstatement of the Warranted Financial Statements if the project spanned multiple years.[312]

In any case, at this stage, the lack of "smoking gun" evidence showing an explicit agreement by EPP to participate in the alleged fraudulent accounting related to the four projects or the Warranted Financial Statements does not support summary judgment. I find there is sufficient circumstantial evidence that creates a genuine issue of material fact over whether EPP intentionally agreed with NCM to create fraudulent statements and induce LVI based on those statements. Because EPP held most of NCM's equity, had the opportunity to direct the accounting at a high level and in a suspect manner, and had the motive to inflate financials to increase NCM's stake in the Merger, I find the evidence, reviewed above, sufficient at this stage to reasonably infer an agreement between EPP and NCM regarding the alleged fraud. Therefore, I deny EPP's Motion for Summary Judgment on LVI's claim of conspiracy to commit fraud.

### 4. EPP is Entitled to Summary Judgment for Unjust Enrichment

Finally, EPP has moved for summary judgment of LVI's claim for unjust enrichment. "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the

---

[312] LVI also lists projects associated with the alleged earnings mismanagement that experienced profit reversals post-Merger. *See* LVI Ans. Br. To EPP, at 16–18. EPP disputes whether this evidence shows that the alleged earning mismanagement *caused* these later profit reversals.

75

absence of justification, and (5) the absence of a remedy provided by law."[313]  EPP

asserts that the evidence of enrichment is insufficient to withstand summary

judgment.  To avoid summary judgment, there must be facts from which I may infer

each element.  The enrichment, further, must not be speculative, attenuated, or too

indirect to support a relationship to the loss.[314]  The remedy—disgorgement of the

unjust enrichment—is equitable; it falls away if there is a tort remedy available.  LVI

is actively pursuing such a tort remedy, of course, and the unjust enrichment claim

therefore necessarily provides only an alternative remedy.  Thus, I must examine the

record to see whether, even if (and only if) EPP proves not to have committed the

torts LVI has alleged, it nonetheless must disgorge gains from the Merger.

LVI offers three pieces of evidence regarding EPP's unjust enrichment.  First,

it states that "the EPP Defendants were unjustly enriched when they received 37.5%

of LVI in exchange for their worthless interest in NCM."[315]  But EPP did not receive

37.5% of LVI; NCM received 37.5% of NorthStar. In other words, the Merger,

according to LVI, benefitted EPP because the enterprise value of its stake in

NorthStar was more valuable than its larger stake, pre-Merger, in NCM.

Presumably, this benefit was unjustified, because it resulted, per LVI, from NCM's

---

[313] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

[314] *Id.* at 60–61.

[315] LVI Ans. Br. to EPP, at 53.

fraud. But if EPP is itself an innocent investor, what value has been transferred to it from LVI? The evidence is that the combined entity has been sold, with NCM—and indirectly EPP—retaining no equity value. There is nothing in the record to show that EPP ever realized any value from the Merger. If it had, any such value would have had an attenuated relationship to the loss suffered by LVI, which only indirectly benefitted EPP by "enriching" a company largely—but not entirely—owned by EPP. This sort of relationship has been considered too attenuated to the impoverishment to support an unjust enrichment claim.[316] In any event, there is simply no evidence that EPP realized a gain related to the impoverishment.

LVI next points to management fees paid to EPP Management (one of the EPP entities) under the Contribution Agreement.[317] The provision in the Contribution Agreement simply states that NCM paid fees it owed to EPP Management, and that it would pay all outstanding fees. This does not suggest the fees were incurred because of or as a result of the Merger. NCM already owed the fees, and the Contribution Agreement clarified that NCM would pay them. There is

---

[316] *See Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 61 (Del. Ch. 2012) ("[Defendant] only benefitted to the extent that the reduction of risks of [subsidiary's] failure improved [defendant's] balance sheet and increased the 'potential dividends' [defendant] might have collected from [subsidiary]. In any event, the direct benefit of [the] loan ran to [subsidiary], not to [defendant].").

[317] Contribution Agreement, § 1.3(d) ("The parties acknowledge that $1,345,207.85 was paid prior to the Funding Date to Evergreen Pacific Partners Management Company, Inc. . . NCM Holdings shall and hereby does assume all other accrued and unpaid management and letter of credit fees and expenses due and owing by the NCM Subsidiaries to Evergreen Pacific Partners Management Company, Inc. . .").

nothing indicating the payment of the fees was unjustified, or worked an enrichment on any EPP entity.

Similarly, LVI points to $5.4 million in preexisting loans made by EPP to NCM, more than $15 million in indemnity related to NCM's surety program, and $1.5 million in promissory notes, and it alleges that only the Merger's consummation allowed NCM to either pay EPP back or keep the surety from being triggered.[318] An allegation that EPP received benefits because the bargain struck between LVI LLC and NCM put NCM in a better position to fulfill preexisting obligations to EPP is the sort of indirect relationship between harm and benefit that falls short of the showing required for equity to act. Again, to support a claim for unjust enrichment, the enrichment must be unjustified. Simply alleging that NorthStar/NCM were able to satisfy pre-existing obligations to EPP, post-Merger, does not state a claim for unjust enrichment.[319]

For the reasons explained above, summary judgment is warranted in favor of EPP on LVI's unjust enrichment claim. EPP also argues that it is immune from an unjust enrichment claim under the exclusive-remedies provision of the Contribution

---

[318] LVI Ans. Br. to EPP, at 54; Morris Aff., Exs. 113–16.

[319] I emphasize again that if EPP conspired to defraud LVI, or aided and abetted NCM's fraud, there is a legal recovery available, obviating application of the equitable unjust enrichment claim.

Agreement. LVI counters that the contractual limitations are inapplicable to EPP, a non-party. Because of my decision above, I need not reach the issue.

*C. Khara's Motion for Summary Judgment*

Khara has moved for summary judgment on LVI's claims for fraud and fraudulent inducement. As noted above, common law fraud and fraudulent inducement require showing the same elements:[320]

> (i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages.[321]

Unlike EPP, Khara is not a separate entity from NCM for the purpose of LVI's fraud claim because, as an employee and executive, he acted as NCM's agent. Therefore, Khara cannot—and does not—argue that even if he facilitated fraud, that fraud was in fact perpetrated by NCM, and not by him. Instead, Khara bases his motion on two arguments attacking the evidence regarding other prongs of LVI's fraud claim: first, that LVI has not properly shown that the alleged fraud proximately caused its damages; second, that even if NCM committed fraud, LVI has not shown that Khara facilitated it. For the reasons explained below, I do not consider either argument persuasive.

---

[320] *Smith v. Mattia*, 2010 WL 412030, at *5 n.37 (Del. Ch. Feb. 1, 2010).

[321] *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015) (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).

## 1. Khara's Argument Regarding Causation does not Warrant Summary Judgment

Khara's first argument centers on the last element of fraud: causation. Even if fraud occurred, Khara argues, LVI has not offered any evidence showing that the fraud caused the damages LVI seeks, which are substantial. Instead, Khara contends that the parade of business horribles following the Merger—personnel shakeup, branch closings, underperforming projects, damaging litigation, historic troughs for scrap markets—more than adequately account for NorthStar's southbound trajectory. In the face of this alternate causation, Khara argues it is improper for LVI to turn to him as a source of recovery for its bad business investment. At this stage of the litigation, I disagree.

To succeed—as Khara points out—LVI needs to offer evidence showing damages causally related to Khara's fraud.[322] At the summary judgment stage, this requires evidence that the fraud directly caused *some* damages; in other words, enough evidence to show that LVI deserves the opportunity to prove the amount at trial. Khara's argument improperly conflates the summary judgment showing with a post-trial damages analysis, demanding that LVI offer evidence showing it was NCM's fraud in the Merger that proximately led to the zero cash equity sale in 2017. But LVI is not required to show this. Assuming that fraud occurred, LVI need only

---

[322] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 815 (Del. Ch. 2014) ("To be actionable, a fraudulent misrepresentation or omission must cause the plaintiff to suffer damages.").

offer evidence that the fraud produced some damages to survive summary judgment regarding causation.[323] To my mind, LVI has done so in two ways.

First, having offered some evidence of fraud related to the Merger, to create an inference that the fraud caused NorthStar's decline, it is enough at this point to show that some allegedly fraudulent NCM projects underperformed expectations following the Merger. Viewing the evidence in the light most favorable to LVI, as I must at this stage, I can reasonably conclude that misrepresented financial statements caused, to some degree, NorthStar's losses.

Second, LVI offers an argument for damages that does not depend on any post-Merger decline in NorthStar's value. LVI split NorthStar's equity with NCM based largely on the companies' respective EBITDAs. Therefore, if NCM fraudulently inflated its EBITDA in its Warranted Financial Statements, then to the extent of NCM's misstatement, LVI surrendered a portion of equity it should have received, and it did so in *direct proportion* to the fraudulent misstatement. Thus, if there were underlying misstatements on NCM's part, then LVI has offered evidence of causally related damages because LVI entered the Contribution Agreement and unreasonably split NorthStar's equity with NCM to the extent that NCM's EBITDA was fraudulently misstated in the Warranted Financial Statements.

---

[323] The issue of Khara's intent is dealt with separately below.

## 2. Khara's Argument Regarding Knowledge of Fraud does not Warrant Summary Judgment

Khara next argues that summary judgment is warranted because LVI's evidence does not show his involvement in the alleged fraud. For the purpose of this motion, Khara argues that if fraud in fact occurred, LVI's evidence fails to show that he knew about it or participated in it.[324] This requires LVI to offer evidence from which I may infer Khara's "contemporaneous knowledge or reckless disregard" of his involvement in fraudulent practices.[325] Because fraud requires scienter, evidence of mere negligence on Khara's part is insufficient to support a reasonable conclusion of fraud.[326]

At the summary judgment stage, "intent can be inferred from circumstantial evidence."[327] It is uncommon for a motion for summary judgment to be granted,

---

[324] Khara's briefing on his Motion for Summary Judgment includes arguments that could be read as seeking judgment on portions of the underlying allegations of fraud, despite the fact that NCM itself has not moved for summary judgment. For instance, on pages 34–35 of his opening brief, Khara argues that LVI has failed to offer any evidence that the 2012 Warranted Financial Statements were materially misstated. *See* Def. Subhas Khara's Opening Br. in Support of his Mot. for Summ. J., D.I. 659 ("Khara Opening Br."), at 34–35. In addition to arguing he lacked knowledge of the fraud, Khara also attacks the strength of LVI's evidence of the underlying fraud regarding the four allegedly fraudulent projects and the so-called Blue Cell Manipulations. *See id.* at 37–47. Considering Khara's briefing as a whole, however, it appears he concedes that the underlying fraud is a disputed material fact and focuses his argument on his own knowledge of and involvement with that fraud, and this is how I treat his argument for the sake of determining his motion.

[325] *See Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 810 (Del. Ch. 2014) (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.*, 854 A.2d 121, 154 (Del. Ch. 2004)).

[326] *See DRR, L.L.C. v. Sears, Roebuck & Co.*, 949 F. Supp. 1132, 1141 (D. Del. 1996).

[327] *ITW Glob. Invs. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.*, 2017 WL 1040711, at *8 (Del. Super. Ct. Mar. 6, 2017).

therefore, solely on failure of proof of intent. In *ITW Glob. Invs. Inc.*, the Superior Court concluded that based on "a wealth of circumstantial evidence relating to knowledge" summary judgment was improper because "[t]his evidence could prompt a factfinder to conclude that [the defendant] was involved in a 'pattern of deception.'"[328] In EPP's similar motion, I found the evidence offered that EPP directed and manipulated NCM's project WIP schedules and interim financial statements to be the sort of circumstantial evidence on which a reasonable factfinder could rely in connection with the conspiracy claim, thus precluding summary judgment on that claim. A similar analysis applies to the fraud claim against Khara. The evidence shows that he directed the adjustments of NCM financial statements in response to EPP's requests or target numbers.[329] Khara often played the "go-between," receiving instructions from EPP and overseeing their implementation.[330] In addition, Khara himself made requests of CFO Kerr to reach target numbers on financial statements.[331]

In addition to this oversight, LVI's evidence shows that Khara was involved in various capacities with the four alleged fraudulent projects. He oversaw the

---

[328] *Id.* at *9.

[329] *E.g.* Morris Aff., Ex. 22, at -83279; Morris Aff., Ex. 21, at -166662837; Morris Aff., Ex. 32, at -16644801.

[330] *E.g.* Morris Aff., Ex. 44, at -16633711; Morris Aff., Ex. 78, at -60439.

[331] Morris Aff., Ex. 92, at -16760591.

bidding for the Apple project, and the regional manager informed him that delays in reporting costs would lead to fade.[332] Khara was directly involved in the financials for the Pepco project, instructing subordinates to submit Change Orders and noting how the Change Order should relate to other items in the financials.[333] On the Sunoco project, Khara understood that there were issues with the unsold LSG Unit, and he represented to LVI that NCM had a letter of intent for a sale, which LVI relied on to accept the reported revenue in the Merger.[334] When Khara instructed Kerr to increase EBITDA to a target number to "help at closing," Kerr responded that he did so, in part, by "[b]ooking . . . an additional $50k of income on the Dupont Hickory job."[335]

In sum, beyond Khara's role in implementing EPP's instructions regarding interim financials and WIP schedules, the evidence shows that he was involved with the financials for each of the four allegedly fraudulent projects in some capacity. The burden will be on LVI to show at trial that all the elements of fraud on Khara's part are met. I find, however, sufficient circumstantial evidence to create a dispute

---

[332] *See* Morris Aff. II, Ex. 73, at -15614872; Morris Aff. II, Ex. 75, at -17688571; Morris Aff. II, Ex. 76, at -17688569.

[333] Morris Aff. II, Ex. 51, at -17384195.

[334] *See* Morris Aff. II, Ex. 84, at -1981047 ("[Khara] claimed to have an 'LOI to sell $5.5 mil' but I did not ask for copy of LOI at the time.").

[335] Dudney Report, at 35–36; Morris Aff., Ex. 78, at -60439 through 440.

of material fact regarding Khara's knowing involvement in the underlying fraud and his fraudulent intent.[336]

### D. LVI Parent's Motion for Summary Judgment

LVI Parent has moved for summary judgment on NCM's claims of fraud and fraudulent inducement. The elements of fraud have been repeated sufficiently above. The parties agree on the relevant substantive facts, namely that (1) LVI Parent negotiated the merger with NCM, (2) LVI Parent created LVI LLC shortly before the Merger, (3) LVI Parent became a subsidiary of LVI LLC, and (4) LVI LLC then contributed LVI Parent to NorthStar as part of the Contribution Agreement. Further, the parties do not dispute that LVI Parent created the financials that became the Warranted Financial Statements attached to the Contribution Agreement. Nor do the parties disagree that LVI Parent made no representations about the Warranted Financial Statements in the Agreement.

Rather than a factual dispute, the parties disagree about a unique question of law created by the unique merger structure: when two companies contribute subsidiaries as assets to form a third company, and they maintain an equity stake in that new company, can they sue the *contributed entities* for fraud? To state the issue stripped of nuance, NCM argues that liability in tort inhered in LVI Parent, that none

---

[336] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 810 (Del. Ch. 2014) (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.*, 854 A.2d 121, 154 (Del. Ch. 2004)).

85

of the transactions at issue transferred this liability to any other entity, and therefore the liability still resides in LVI Parent. LVI parent, on the other hand, argues with equal conviction that in light of the structure of this transaction, a holding that an asset contributed to NorthStar is itself liable for fraud in the creation of NorthStar would be nonsensical. It appears that this question, in light of the structure of the Merger, is one of first impression.

I hesitate to decide this issue without a record at trial. The trial will go forward in any event, and an opinion granting summary judgment here would be, in practice, advisory if the LVI interests in general prove not fraudsters. Summary judgment is inappropriate where, as here, "upon an examination of all the facts, it seems desirable to inquire thoroughly into them in order to clarify the application of the law to the circumstances."[337] Therefore, LVI Parent's motion for Summary Judgment is denied without prejudice to the legal issues inherent therein.

### III. CONCLUSION

For the foregoing reasons, I grant in part and deny in part LVI's Motion for Summary Judgment. Specifically, that motion is granted as it relates to the Alcoa project and denied as it relates to the remainder of the allegedly fraudulent projects. I grant in part and deny in part EPP and NCM's Motion for Summary Judgment. Specifically, that motion is granted on the claims against EPP for fraud and unjust

---

[337] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962).

enrichment and denied as to the remainder. I deny Khara's Motion for Summary Judgment. I deny LVI Parent's Motion for Summary Judgment without prejudice to the legal issues raised therein. The relevant parties should submit a form of order consistent with this Memorandum Opinion, and should submit memoranda regarding how my decision here affects the pending Motion to Dismiss and Motion for Summary Judgment filed by the CHS Defendants, and the pending Motion for Summary Judgment filed by Scott State, if at all.